## THE CARRIE.[1]

### (District Court, E. D. Virginia.  January 25. 1883.)

SALVAGE—COMPENSATION.

 A steamer, heavily laden, suddenly sprung a leak, and quickly filled, in the narrow channel of the James river.  She was hastily abandoned by her master and crew, without casting anchor or setting lights, and settled lightly on the bottom, where she was liable to be run into by several large ocean steamers which were due to pass the following night.  At her master's request, a steam yacht went to her rescue, and in the course of two or three hours towed her to a wharf.  *Held*, that this was a salvage service, for which $600 should be awarded on a salved value of $2,400.

This was a libel in rem filed by J. L. Schoolcraft against the steamer Carrie and cargo, to recover salvage.  On the afternoon of December 15, 1882, the Carrie, which was coming up the James river heavily laden, bound for Petersburg, sprung a leak, and suddenly began to sink while in the vicinity of Blair's wharf.  Her master and crew hurriedly left her in a small boat, and, some time later, wet, chilled, and exhausted, reached a schooner in the river.  They had had no time to cast an anchor or put up anchor lights.  The boat sank in the channel, grounding slightly in deep water, where she was liable to be run into by large steamers, several of which were due to pass during the night.  Soon after the disaster, the yacht Mary arrived in the vicinity, and, in answer to a signal, went alongside the schooner on which the master and crew of the Carrie had taken refuge.  At the master's request, she first put himself and the crew ashore at Blair's wharf, and then went to the Carrie, which she succeeded in towing to the same point in the course of two or three hours.  The master then resumed control of her.

Jackson & Sands, for libelant.

Chas. S. Stringfellow, for respondent.

HUGHES, District Judge.  This is plainly a case of salvage, and a case for a liberal salvage reward.  The Carrie was in a helpless condition; her own crew powerless to save her, and hopeless of doing so.  Her master called upon the owner of the Mary to undertake the rescue of his vessel, and spoke of 50 or 75 per cent. of the value raised as the probable reward.  The fact that no anchor was thrown out, and no light put up, conclusively evidenced abandonment.  It can hardly be said that in a case of abandonment in a river, with the land of each shore in sight, there was no *animus recuperandi*.  But, if this like abandonment had occurred on the high seas, the case would have been one of absolute derelict.  The vessel was in imminent peril.  She was likely either to sink, and to be crushed on the bottom by the powerful steamers soon to pass up and down, or, if she had continued afloat, she was liable to be collided with and sunk by the same great

---

 [1] This case has been heretofore reported in 5 Hughes, 445, and is now published in this series, so as to include therein all circuit and district court cases elsewhere reported which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

vessels. The mere fact that the work of saving occupied the Mary only two or three hours does not materially affect the case. In the case of The Blackwall, 10 Wall. 1, where fire engines from San Francisco put out a fire on the steamer in the harbor in 30 minutes, the supreme court of the United States sanctioned an award of many thousands of dollars salvage. Really, the only open question in the case is, what shall be the amount of award? I consider the value of the Carrie after she was delivered at Blair's wharf was $2,400. I will give a decree for a fourth of this value; that is to say, for $600. As to the portion of the cargo that was saved, I will give a decree for half its net value.