## The Florida.[1]

## The Howard Drake.[1]

### (*Circuit Court, S. D. Georgia.* December, 1884.)

1. Salvage—Ships at Wharf in Peril of Fire.

    Ships tied up to a wharf that can be aided when in peril of fire without great personal danger by volunteers from shore, ought not, when so rescued, to have added to their other misfortunes the expense of rewarding excessively all comers to whom the opportunity is given to render aid without showing much gallantry, heroism, or endurance, and without running risk of life or limb. At the same time persons rendering successful maritime services to ships in peril are entitled, under maritime laws, to reward as salvors.

2. Who may be Salvors—Day Watchman Rendering Salvage Services at Night.

    Where salvage services were rendered to a vessel in peril of being destroyed by fire during the night-time, by a person who was employed upon her as a day watchman, *held*, that as it was wholly voluntary with him to render the services or not, that as it was no part of his employment or duty to render services at night, after he had been regularly relieved by the night watchman, he is entitled to his share of salvage.

Admiralty Appeal.

*Richards & Heyward*, for libelant.

*Garrard & Meldrim*, for claimants.

Pardee, C. J. On the twelfth day of June, 1882, the steamer Florida and the steamer Howard Drake, both belonging to the same transportation company, were laid up in the port of Savannah, on the north side of the river, at a wharf, on which was a building used by the Savannah Oil Company, and with large quantities of oil stored therein; both ships being without crews, and under charge of one night watchman. About 2 o'clock in the morning a fire broke out in the oil building, which fire gained great headway, and resulted in burning the building and considerable of the wharf on which the building stood. This fire greatly endangered both steamers, and it seems now to be conceded that, but for the services of certain volunteers from the city of Savannah in putting out the fire, which actually caught on the Florida, and in moving both steamers up stream out of danger, both steamers would have been actually lost. The services rendered by these volunteers are conceded by the claimants to be low-grade salvage services; and in this I concur. Ships tied up to a wharf, that can be aided when in peril of fire, without great personal danger, by volunteers from shore, ought not, when so rescued, have added to their other misfortunes the expense of rewarding excessively all comers to whom opportunity is given to render aid without showing much gallantry, heroism, or endurance, and without running risk of life or limb. At the same time, persons rendering successful maritime services to ships in peril are entitled, under maritime laws, to rewards as

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

salvors. In the case of the Florida and Howard Drake, it seems unlikely that any of the salvors could have risked much peril. Escape from the steamers was easy, and when any one found the fire too hot for him he could have retired. No one was injured, and the outside damage involved only some injury to wearing apparel. Some 13 persons, including the night watchman, were around and aboard the steamers, and each rendered more or less service in rescuing them. Three gentlemen from the city—Messrs. Branch, Rutzler, and Fernandez—took a leading part, and, from the intelligent manner in which their evidence is given, I cannot avoid the conclusion that their services were more valuable to the steamers than those of any or, perhaps, all of the other volunteers. It seems the claimant thought so, for, on their declining to join in the libel for salvage, the claimant presented them with a complimentary letter and $333.33⅓ each. The evidence discloses that Joseph Jeannet also rendered very valuable service to the Florida; for, procuring a small boat and an ax, he had the presence of mind to go around the stern of the Florida and sever her stern lines, which enabled the Florida to swing with the incoming tide, and thus to be removed further from the burning oil, and then used his boat to carry Branch, Rutzler, and Fernandez over the river to give their aid. He does not join in the libel for salvage, and states that he was settled with by claimant.

The night watchman, as his duty required, rendered very efficient aid, and he joined in the original libels for salvage, but afterwards, and before decree in the district court, he voluntarily dismissed his claim. The remaining eight joined in the libels against both the steamers, and all were allowed in the consolidated decree $50 each, except George L. Coggins, whose claim was rejected, apparently, on the ground that he was one of the crew of the Florida, and therefore could not be a salvor. All have appealed, and the questions argued and presented here are: (1) Was Coggins entitled to salvage for his services, admitted to have been valuable? (2) Did the judge of the district court sufficiently appreciate the services of the other libelants? Coggins had been in the employ of the Florida as steward before she was laid up, and says that he was expecting to go on her again when the season opened. In the mean time he was employed aboard the Florida as a day watchman, his duty requiring him to go on watch at 7 in the morning and remain until 6 in the evening. He was not required to and did not sleep on the steamer, but at night he came over the river to his home in Savannah. On the night of the fire he was at home, and on the alarm being given he hastened to the river and then got over as quickly as he could. The evidence shows that his first idea was that the steamer would burn, as it was already on fire and in a place of increasing danger, and his first efforts looked to the saving of his own effects (some clothes) and the ship's valuables; but almost immediately, on more help arriving, he turned to and rendered, as all concede, valuable assistance. "A salvor is one who, without

any particular relation to a vessel in distress, proffers useful service and gives it as a voluntary adventurer without any pre-existing covenant connecting him with the duty of preserving the vessel." Cohen, Adm. 54. So that the question is whether it was in the line of Coggins' duty, under his employment as a day watchman, to render aid and assistance to the Florida whenever she might need it in the night-time. The statement seems to answer itself. It was wholly voluntary to go or not. His contract covered no work at night, and it would seem that if he did render services at night at the request of the owners he would be entitled to compensation therefor on the principle of *quantum meruit*. It is difficult to see what his previous employment and expected future employment as steward has to do with the matter. It seems clear to me that it was no part of Coggins' employment or duty to render services to the Florida at night after he had been regularly relieved by the night watchman, and I therefore take it that he is entitled to his share of salvage in this case.

The remaining question is as to the amount of salvage proper to award among the libelants. The salved steamers are agreed to have been worth $15,000. The services rendered were very laborious, and covered in all about three hours' time. In awarding salvage the courts give either a lump sum, considering the value of the services as well as the proper reward, or a certain portion or per cent. of the property saved. The learned judge who heard this case in the district court did not record his method of reaching an amount, but awarded each libelant a fixed sum. My own view is that 6 per cent. of the salved property, or $900, would be a reasonable and proper amount of salvage in this case. The supreme court approved 10 per cent. when a ship anchored in the harbor was saved from fire. *The Black-wall*, 10 Wall. 1. Justice Woods allowed $4\frac{1}{2}$ per cent. in the case of the Louisiana, aground on shoals near the mouth of the Mississippi. But the fact is, hardly any salvage case can furnish a rule for amount of allowance in another. See rules and general principles and particular cases in Cohen, Adm. 87 *et seq.*

The amount of salvage being determined, there remains the apportionment. Twelve persons participated, more or less, in the services rendered, who can be classed as salvors. In the argument great stress was laid upon the evidence as showing that a few persons did all, and that the others of the twelve were of no use. Notwithstanding the miserable condition of the record, I have carefully read all the evidence, and have reached the conclusion that while some, from superior intelligence, accompanied with presence of mind, rendered more effective service than others, all the persons embraced in the libel rendered service as they were able, entitled to rank as salvage service, and entitling them to share the reward. At the same time, I think they are not entitled to share in equal amounts. An equitable award, and one in keeping with the object of salvage, will be to put down Branch, Rutzler, Fernandez, Jeannet, and Coggins at $100 each, and distrib-

ute the remainder among the libelants Austin, Peterson, two Dixons, Honig, Goette, and O'Neil, share and share alike. The shares awarded Branch, Rutzler, Fernandez, and Jeannet will inure to the benefit of claimant, as these parties do not appear as libelants, but admit having been satisfactorily compensated. A decree will be entered according to this distribution, and taxing costs to claimants.