THE BRANDOW.[1]

THE BESSARABIA.

BOYLE, Master, etc., *v.* THE BESSARABIA, etc.

*(District Court, E. D. South Carolina.* February 3, 1887.)

1. SALVAGE—UNNECESSARY ASSISTANCE.

One who voluntarily goes to the assistance of a vessel in distress, with the intent and hope of aiding her, but who fails to arrive until his assistance has ceased to be necessary, is not entitled to compensation as a salvor, nor is his *status* altered by reason of the circumstance that he participated in the efforts to save the vessel, if at the time of arrival his assistance was not required.

2. SAME—COSTS—UNNECESSARY ASSISTANCE—INTENT—EFFECT OF.

While one who goes to the assistance of a vessel in distress, but who fails to arrive until the necessity for his aid has ceased to exist, cannot claim as a salvor, the court will, in considering the question of costs, have a due regard for the intent and hope of the libelant, and, if it appears that the efforts of the libelant were made with the intent and hope of rendering assistance, the costs will be divided.

In Admiralty. Libel for salvage.

*A. G. Magrath,* for libelant.

*Mitchell & Smith,* for claimant.

SIMONTON, J. On the morning of the eighteenth January, 1887, about half past 12 A. M., a fire broke out in the Bessarabia, then loading with cotton in the port of Charleston, at Atlantic Wharves. The steam-ship was built in compartments. One of these forward was divided into two parts by wooden bulk-heads. There were in the ship, when the fire broke out, some 1,100 bales of cotton. About 400 of these bales were in the compartment aft, the remainder were in the compartment forward. Smoke was seen coming out of the forward hatch, and the fire was evidently in the forward compartment. The alarm of fire was first given by the watch on the ship. The master of the steam-ship, coming on deck, set his pump going, and sent a stream of water down the forward hatch with the ship's hose. He sounded no alarm from his vessel, but he requested the watchman on the wharf to sound the city fire alarm, and thus to summon the city fire department. In five minutes this was done. The fire department responded at once, and were on the scene of action in five or six minutes after the alarm was sounded, with five steam fire-engines, having four others in reserve. As soon as the fire department arrived, its chief took charge of the fire, with the full concurrence of the master of the steam-ship, and in a short time had 4, and soon afterwards had 10, streams of water pouring into the forward hatch, from hose discharging each about 800 gallons of water a minute. This steady stream of water produced its natural result. The fire was at once under control, and after some time was subdued. After the fire was out, and

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

the city fire department had left the steam-ship, some fire appeared on several bales of cotton in the second division of this forward compartment. This was extinguished easily, the hold being full of water.

When the first alarm calling out the fire department was sounded, the libelant was at home in bed, about two squares from his tug, which was lying at Adgers' wharf. He was roused at once, dressed, went to the tug, and, her fires being lit, got up steam, and proceeded to the Bessarabia. He fixes the time at which he reached the steam-ship at a quarter to 1. It is immaterial to fix the exact minute. All of the witnesses agree that the tug reached the steam-ship just about or just after the pinnace had been let down into the water. The pinnace was lowered in order that it should go to the bow of the steam-ship, and carry a line from her to the next dock. This was done under the direction of the chief of the fire department, for the purpose of preventing the steam-ship from listing, because of the quantity of water which was pouring into her. Its purpose was to keep the steamship on an even keel. This was done to facilitate the extinguishment of the fire. The tug, on coming alongside of the steam-ship, waited until the pinnace was clear of her, and then called to some one on the deck of the steam-ship to take her lines. This was done by the carpenter, in the presence of the second mate. The latter hailed the tug, and asked why she came alongside, and if she had orders to tow the ship from the dock? No reply was heard to this query. As soon as libelant had made his tug fast, he went on board the Bessarabia, and soon had the hose of the tug passed into the steamship. He did not ask for nor report himself to any officer of the ship or of the fire department. There is, again, some conflict of testimony upon the point whether the tug pumped any water into the ship or not. I find that the hose of the tug, with or without a nozzle, was passed into the forward hatch, and did pour a stream of water for some minutes, between five minutes and a half hour, and that, as soon as this was observed, the hose of the tug was taken away by the concurrent action of the master of the steam-ship and the chief of the fire department; that there was no resistance to this on the part of the libelant. He remained alongside of the steam-ship in his tug a short time afterwards, when he was ordered away. The tug was provided with hose about two to two and a half inches in diameter.

| | |
|---|---:|
| The value of the ship is, | $75 000 |
| The cargo, | 45 000 |
| | $120 000 |

| | |
|---|---:|
| Of the cargo there was damaged by water, bales of cotton, | 535 |
| By fire, | 119 |
| By water, slight, | 35 |

This cotton has all been sold for $21,056 gross.

Is this a salvage service? "The relief of property from an impending peril of the sea, by the exertion of those who are under no legal obligation to render assistance, and the consequent ultimate safety of the property, constitute a case of salvage. It may be a case of more or less merit,

according to the degree of peril in which the property was, and the danger and difficulty of relieving it.    But these circumstances affect the degree of the service, not its nature." *The Alphonso*, 1 Curt. 376.    One essential element in estimating the compensation for salvage is the degree of the danger from which the property was rescued.    *The Blackwall*, 10 Wall. 1; *The Sandringham*, 10 Fed. Rep. 573.

In order then to constitute a salvage service, the property must have been in peril, and must have been relieved by the services of the person claiming salvage, either rendered alone, or in combination with others; and the safety of the property must have been consequent on—that is to say, a consequence of—such services, in whole or in part.    The fact has been found that the tug came alongside of the steam-ship after the latter had been placed, with full concurrence of her master, in the charge of the city fire department; that this department was fully equipped for such service, having five steam fire-engines on duty actively, and four in reserve; that the fire department had the fire under control, and extinguished it; that the ship was in no danger, and that the fire could not spread in her cargo; that the fire itself was diminishing, and the vessel was being filled with water at the rate of from 5,000 to 8,000 gallons per minute. When the tug arrived the ship and cargo, to all intents and purposes, were already saved.    Under these circumstances, the libelant could give no assistance.    None was needed.    He could not have contributed towards the safety of the ship and cargo, for when he reached the steamship she was under the control of the department, and her safety thus insured.    There can be no doubt, however, that the libelant went to the Bessarabia with the intent and hope of aiding her.    Courts always favor intent of this kind.    If, when he reached the steamer, he had communicated with her officers, or any one of them, or with the fire department, tendering his aid, and if, when ordered away, he had remonstrated, a different result might have been reached.    At all events, he should not be punished.

I am of the opinion that he is not entitled to salvage, and that the libel should be dismissed, the costs to be divided.