### THE ADELAIDE T. CARLETON.

(District Court, D. Connecticut. July 8, 1914.)

#### No. 1704.

SALVAGE (§ 13*)—RESCUE OF DISABLED SCHOONER—NATURE OF SERVICE.

A schooner, worth with her cargo about $15,000, during a storm and dense fog, was blown upon a rock in Long Island Sound, causing her to leak somewhat, and so injuring her rudder fastenings as to render her unable to navigate. In the morning she displayed a distress signal, in response to which she was towed to port by a tug, under an agreement that the price should be fixed by the underwriters at New Haven, which, however, was not done. Held that, while the schooner was not in immediate danger, her master was evidently in doubt as to his ability to reach port, and the service so rendered by the tug was a salvage service, for which she was entitled to an award of $750.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 15; Dec. Dig. § 13.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by the New England Transportation Company, for itself and the crew of the tugboat Resolute, against the schooner Adelaide T. Carleton. Decree for libelant.

Clifford I. Stoddard, of New Haven, Conn., for libelants.

Carpenter & Park, of New York City, for claimant.

Frederick H. Wiggin, of New Haven, Conn., for trustee of New England Transp. Co.

THOMAS, District Judge. On the 11th day of March, 1912, the schooner Adelaide T. Carleton, of Rockport, Me., of the burden of about 208 tons, left Elizabethport, N. J., via Long Island Sound, bound for Stockton Springs, Me., having laden on board a cargo of about 360 tons of fertilizer.

On the night of March 15th, and during the prosecution of said voyage, a very severe storm out of the northwest had raged, accompanied by heavy rains and dense fog. On account of the fog it was impossible to make accurate observations of the position of the schooner, and about 5 o'clock on the afternoon of the 15th she was blown upon Goose Rock, near Falkner's Island. With a change of the wind she came off the rocks and anchored with both anchors in deep water, where she lay in a fairly calm sea with the wind blowing from 15 to 19 miles an hour, until the morning of the 16th. She was making water slowly, which her crew was able to take care of with the pumps; but her rudder was unhung out of the lower pintle, rendering the rudder useless. About 6:30 that morning the captain ordered the signal of distress, the American flag, Union down, put in the rigging, which order was obeyed.

At 5 o'clock on the morning of the 16th the steam tug Resolute, belonging to the New England Transportation Company and in command of a captain, with a pilot and four deck hands on board, left New London bound west for New York through Long Island Sound. About 7 o'clock in the morning the captain and pilot of the Resolute sighted the Carleton about two miles off shore from Falkner's Island, flying the American flag, Union down. The Resolute changed her course about two points and bore down upon the schooner, which was at anchor as already described.

The captain of the Resolute drew alongside of the schooner, and Captain Kent, commanding the schooner, had a conversation in the pilot house of the Resolute with Captain Snow. This conversation related to the condition of the schooner, and Captain Kent requested that Captain Snow tow the schooner to New London. This he refused to do, but agreed with Captain Kent to tow the schooner to New Haven harbor. Before undertaking the work it was agreed to submit the value of the services to the underwriters at New Haven.

Upon arriving at New Haven the schooner was drawn up alongside of canal dock and beached in the mud. The matter of the value of the services was never submitted to the underwriters. At New Haven a survey was made of the schooner, and the surveyors found "that on sounding the pumps the vessel has but six inches of water in her, and that at no time had she had over eight inches, and we also find that

her rudder is unhung out of the lower pintle," and recommended that she be towed to New London, put on the dock, and that temporary repairs be made there. Rubber gaskets were procured on shore at New Haven with which to fix the after pump, and on the following day the schooner was towed, without any further repairs, to New London by a New Haven harbor tug in company with two scows, and at New London was dry-docked, where temporary repairs were made to her rudder and keel. The value of said repairs was $408, and in the course of a short time, under one sail, she continued on to her destination, Stockton Springs, Me., where she discharged her cargo of fertilizer, which was intact as the result of her experience.

At the time the Resolute drew alongside of the schooner, the wind was blowing west, the sea was not rough, but choppy, and the atmosphere was clear, and in towing the schooner to New Haven no risks, in addition to the ordinary risks of navigation, were taken by either the tug or its crew. The schooner, it was claimed by the libelants, was in such a position as to be unable to get out without a rudder, as the wind was blowing from the west, and she was, so to speak, in a pocket, and could not get out without help, and I find this claim to be true.

While Captain Kent testified that he could have laid there for a long period of time with the wind and water as it then was, yet it is significant that he at least must have thought that he was in more or less of a dangerous condition, in view of the fact that he hoisted his signal of distress, and not a towing signal. Of course, he had no knowledge as to the exact damage that had been done to his vessel, nor could he tell whether it would be possible for him to sail, even if he had a rudder, to New Haven or New London, without the vessel leaking badly. The question is: What were Captain Kent's beliefs as his vessel lay at anchor with reference to his ability to get under way without help? After she was put upon the dry dock it was ascertained that she could have continued on without serious danger from leaking; but with her rudder out of commission, and the signal of distress flying, it seems conclusive that Captain Kent must have been quite uncertain about his ability to safely move at the time the Resolute approached.

It was testified that $50 to $75 is reasonable compensation for a tug to go from New Haven harbor and tow such a vessel to the place where this one was landed in New Haven harbor; but it seems to me that there is more in this transaction than mere towage. It must have been evident to Captain Kent's mind that he expected to pay, or that the owners expected to pay, more than mere towage, else the conversation with the captain of the tug Resolute in the pilot house would have definitely fixed the towage services, as Captain Snow had been a tug captain in the waters of Long Island Sound for 27 years, and familiar with navigation and towage charges in and about the sound. It seems to me that Captain Kent must have realized that he was in some kind of danger, and, although that danger was not imminent, yet it was sufficient to produce the belief in his mind that he needed as-

sistance, and needed it enough to order a signal of distress to be attached to the topmost part of the rigging.

In The Blackwell, 77 U. S. (10 Wall.) on page 13, 19 L. Ed. 870, the Supreme Court said:

"Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service:

"1. The labor expended by the salvors in rendering the salvage service.

"2. The promptitude, skill, and energy displayed in rendering the service and saving the property.

"3. The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed.

"4. The risk incurred by the salvors in securing the property from the impending peril.

"5. The value of the property saved.

"6. The degree of danger from which the property was rescued."

In view of all the circumstances and conditions then existing, I find the libelant entitled to recover low salvage. What, then, becomes fair compensation for the salvage of the schooner and her cargo? The schooner was worth approximately $4,000 and the cargo $10,063.

From all of the facts and circumstances I find that $750 is fair compensation, and order said amount to be apportioned as follows: Seventy-five per cent. to the owners and twenty-five per cent. to the crew of the Resolute in proportion to their wages, after the captain of the Resolute is awarded $100 for his services.

Let judgment therefor be entered for the libelants in the sum of $750 and costs, and a decree accordingly.