**W. E. JACKSON, Plaintiff,**

v.

**COSTA LINES, INC. et al., Defendants.**

**No. 78–6536–Civ–WMH.**

United States District Court,
S. D. Florida,
Fort Lauderdale Division.

May 29, 1980.

**394**

David P. Karcher, Underwood, Gillis, Karcher, Reinert & Valle, P.A., Miami, Fla., for plaintiff.

C. Douglas Skinner, Fowler, White, Burnett, Hurley, Banick & Strickroot, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, District Judge.

This case is brought under the admiralty and maritime jurisdiction of this Court by plaintiff, W. E. JACKSON, against defendants, COSTA LINES, INC., COSTA ARMATORI, S.P.A., in personam, and the T/S FEDERICO "C", her engines, boilers, etc., in rem. Plaintiff has sought, in the alternative, damages for breach of contract, specific performance of the contract, or rescission of the contract and an award of salvage for services allegedly performed in the salvaging of the T/S Federico "C", a vessel owned and/or operated by defendants, Costa Lines, Inc., and Costa Armatori, S.P.A. During the period December 8, through December 12, 1973, plaintiff performed services upon the vessel for which he now claims a right to salvage. It was alleged that plaintiff and defendants had entered into an agreement by which the plaintiff was to receive "free unlimited lifetime cruising privileges aboard any Costa Lines vessel." It is contended that the defendants afforded him such cruises as he requested until late 1977, at which time he, by a series of letters to the defendants, requested a confirmation of their agreement in writing. The defendants apparently declined to answer his correspondence, and this lawsuit ensued on December 8, 1978.

The defendants answered the complaint, denying its allegations, and pleading as affirmative defenses, the Statute of Frauds and Statute of Limitations. A unilateral pretrial stipulation was filed by plaintiff on February 4, 1980, and a separate pleading was filed by the defendants in which they "adopt[ed] and ratifi[ed] the unilateral pretrial stipulation filed by the plaintiff this cause."

At the outset of the trial, the defendants made a motion for dismissal for lack of jurisdiction over the subject matter on the grounds that the statute of limitations applicable to salvage, 46 U.S.C. § 730, prescribes a two-year period for salvage actions. Since this action had not been filed within two years of the date upon which the salvage services were rendered, defendants contended that this Court had no jurisdiction of plaintiff's claim for salvage.

## FINDINGS OF FACT

1. Plaintiff, W. E. Jackson, is a licensed harbor pilot operating out of Port Everglades, Florida. He obtained his U. S. Unlimited Masters License in 1944 and had been working as a Port Everglades pilot for over twenty-five years.

2. On the morning of December 8, 1973, at or about 7:00 a. m., under dense fog conditions, the defendant vessel T/S Federico "C" went hard aground on a reef approximately two to two and one-half miles North of the Port Everglades Channel, directly in front of and one-half mile offshore from the Fort Lauderdale beaches and hotel complexes. Initial efforts by the officers and crew to free the vessel from its grounding with the use of the ship's engines alone were unsuccessful.

3. Within the hour the plaintiff, Captain W. E. Jackson, boarded the vessel. Captain Jackson had come out in the pilot boat in the dense fog and was proceeding toward the Federico "C" under the assumption that it was a rather small freighter coming from the Bahamas. Upon reaching the Federico "C" he went aboard and was told by the

ship's master and his friend, Captain Zonca, that they were hard aground. It is apparent from the circumstances that it was not possible for plaintiff to "pilot" the vessel into port, as she was incapable of being moved at that time. Although Captain Jackson may have come aboard the vessel in his capacity as a pilot, his services as a pilot were not required and in fact could not have been utilized at that time.

4. Captain Jackson offered his services as a salvor to Captain Zonca. Jackson had previous experience with Merritt Chapman and Scott, a salvage firm for which he had worked shortly after World War II as a second mate and chief mate. Captain Zonca accepted the services of Captain Jackson, and Jackson performed those services in his capacity as a salvor and not as a pilot until the vessel was afloat and ready to proceed into port. On the night of December 11, 1973, Captain Jackson resumed his duties as a pilot and brought the vessel safely into port.

5. When the Federico "C" entered the Fort Lauderdale area, she had electronic failures in her radar, fathometer and UHF radio, all of which became inoperative. In the initial days of the salvage attempts, Captain Jackson was the only one aboard the vessel with an operable radio through which all requests for tugs for assistance were relayed via the harbor master's office to agents of the defendants ashore. The orders to the tugs and other vessels assisting in the refloating operation were also given by Captain Jackson over his radio.

6. Captain Jackson took charge of the salvage operation aboard the vessel, with the concurrence of and subject to the command of the master of the vessel. Tugs were obtained to assist in the pulling of the vessel during the high tide periods. Fuel barges were arranged to offload the fuel. The passengers with their luggage, the life boats and other items were removed to lighten the vessel. The vessel's anchors were set back at a 45 degree angle to assist in pulling the vessel off the reef.

7. Although there was some conflict in the testimony concerning the scope of the role played by the plaintiff in the operation, it is clear that he did arrange for at least some of the above-mentioned services. Plaintiff's testimony concerning his role is confirmed by the testimony (by deposition) of Claude Collins, Ship's Port Agent and agent for the defendant owners and managers. Collins testified that Captain Jackson had personally come to his office and requested the services of the tug "Navigator." This vessel was of particular value in that it was of much greater horsepower than any of the local tugs and thus of valuable assistance with its greater pulling power. Plaintiff's testimony is also supported by the testimony of Ulric Sweeting, the chief mate of the tug "Cable," who remembered clearly that it was Captain Jackson's voice over the radio, giving orders to the tugs on the placement of lines and coordinating the pulls.

8. Throughout the period of the salvage operations, the tug, Cable, owned by Murphy Pacific Corporation, a nationwide salvage firm, was present at the scene, ready, willing and able to perform the salvage services to free the Federico "C" from its stranding. Hilary Crusoe, the salvage master of the Cable, testified that his services as a salvor were refused by Nino Clementi, Operations Manager of Costa Lines, because Captain Jackson had undertaken the task of supervising the salvage efforts. The services of Murphy Pacific were, therefore, unnecessary. Clementi testified that if the efforts of Captain Jackson to float the vessel had been unsuccessful, the Cable was standing by and could have been used to further the salvage efforts.

9. Captain Crusoe wanted to obtain the salvage contract on a Lloyds Open Form or no cure-no pay basis, but Clementi was unwilling to make such arrangement. Ultimately, it was agreed that the tug Cable would assist with one pull for a fixed price of $6,000.00. This pull, on the evening of December 11, was successful and the vessel was floated.

Crusoe further testified that the minimum amount for which Murphy Pacific would have agreed to attempt the salvage

was, in his opinion, approximately $100,000.00.

10. During the period of the salvage attempt, Captain Jackson performed services of a low to moderate order of salvage for which he would have been entitled to an award. The vessel was in some peril (although the weather was calm at the time) because northerly storms are common during the winter season and might reasonably have been anticipated while the vessel was aground. Such storms could have driven the vessel further onto the beach and caused extensive damage to the vessel, including the breaking up of the ship or the tearing of holes in the bottom of the fuel tanks, causing fuel leaks and disastrous ecological damage to the Fort Lauderdale beaches.

11. The services of Captain Jackson directly lead to the successful refloating of the vessel without damage to either the vessel or the environment, and permitting her to enter port safely.

12. After the operation ended, plaintiff was asked by Mr. Clementi to submit his bill for the services rendered, so that this bill could be included in the claim to defendants' underwriters. Plaintiff declined to submit a bill, requesting instead that he be allowed to take cruises aboard Costa Lines vessels. Defendants agreed to this proposition, and for several years, Captain Jackson requested and received free cruises, sometimes with a companion, aboard Costa Lines Caribbean vessels. He took perhaps eight or nine such cruises, maybe as many as a dozen, for a total of between sixty-seven (67) and eighty-two (82) days, the value of which was approximately $150.00 per day.

13. Captain Jackson continued to take cruises until sometime in late 1977. On February 10, 1978, he wrote to Costa Lines to ask that their agreement of "lifetime cruise privileges . . . on any Costa Line vessel" be confirmed in writing. Having received no response to this letter, plaintiff again wrote in June 1978 to request written confirmation of the agreement. (Plaintiff's Exhibit # 1). Plaintiff received no response to any of these letters.

14. Mr. Clementi testified that he never agreed to the unlimited, lifetime, worldwide cruising privileges that Captain Jackson suggests, as he did not have the authority to enter into such an arrangement. The agreement, in Clementi's mind, was to allow Captain Jackson cruise privileges, as he requested them, whenever he could be accommodated.

15. While there was apparently some arrangement for cruise privileges under which the parties operated for several years without difficulty, the terms and conditions of this arrangement are disputed. Indeed, it appears that the parties, in fact, never agreed on the scope of the cruise privileges to be afforded plaintiff, at least not in terms of sufficient definiteness to be capable of enforcement by the Court.

## CONCLUSIONS OF LAW

1. Defendants' motion to dismiss this cause for lack of jurisdiction over the subject matter is denied, as the statute of limitations merely constitutes an affirmative defense and is not jurisdictional. The Court, therefore, has jurisdiction over the subject matter under its admiralty and maritime powers.

2. In so far as the statute of limitations (46 U.S.C. § 730) constitutes an affirmative defense, defendants have waived it by their conduct in partial performance of the agreement. From 1974 to 1977, Captain Jackson was granted cruises by the defendants; it was not until 1978, when Captain Jackson requested a confirmation of their agreement in writing and the defendants failed to respond, that problems arose.

In the alternative, the conduct of the defendants in extending cruises in accordance with some agreement with the Captain resulted in a tolling of the statute of limitations until such time as it became reasonably apparent to plaintiff that defendants would not adhere to the terms that plaintiff believed to be their agreement.

The Court of Appeals, Fifth Circuit, has recently held that federal courts have inherent power to hold that the statute of limitations (of 46 U.S.C. § 730) is tolled under certain circumstances not inconsistent with the legislative purposes. *Platoro Ltd., Inc., v. Unidentified Remains of a Vessel*, 614 F.2d 1051 (1980). The purposes served by statutes of limitations, as identified in *Platoro* include: (1) the assurance of fairness to defendants by preventing the revival of claims that have been allowed to slumber until evidence has been lost and witnesses have disappeared; and (2) proper diligence on the part of the plaintiff in preserving his claim. Neither of these purposes would be disserved by the maintenance of this action. As in *Platoro*, plaintiff was not dilatory; he filed this action well within two years from the time he first became aware of a problem with the agreement. Since the defendants have conceded that plaintiff performed valuable services in connection with the rescue of the Federico "C", the interests of justice require the vindication of plaintiff's rights in this action.

3. The defense of Statute of Frauds was abandoned at trial by defendants' counsel and is, therefore, no longer an issue in this case.

■■■ 4. Defendants have argued that plaintiff is entitled to no salvage award because, as a pilot, he was under a pre-existing duty to render assistance. A pilot, while acting in the strict line of his duty, cannot be entitled to claim salvage. Whenever he performs salvage services beyond the line of his appropriate duties, or under the circumstances to which those duties do not justly attach, however, he stands in the same relation to the property as any other salvor. *The Hope*, 35 U.S. (10 Pet.) 108, 119, 9 L.Ed. 363 (1836). Because the T/S Federico "C" was hard aground when Captain Jackson came aboard, she was not capable of being piloted, and the pre-existing duty rule has no application. As stated by Justice Story in *The Hope*: "No one ever heard of its being within the scope of the positive duties of a pilot to go to the rescue of a wrecked vessel, and employ himself in saving her or her cargo, when she was wholly unnavigable."

■■■ 5. The parties are in agreement that Captain Jackson performed valuable services aboard the T/S Federico "C" from December 8th through 12th, 1973. Plaintiff's claim for a binding contract for unlimited lifetime worldwide cruising privileges in return for his services must be rejected, however, as there was never any meeting of the minds regarding the actual extent of cruises to which he would be entitled. In particular, such matters as the number of cruises per year, geographical limitations, length of cruises, whether or not plaintiff was entitled to bring along a guest and what rate, were not discussed. While the parties seem to agree that some sort of "contract" was entered into for cruise privileges, the contract, according to defendants, was limited to fifteen days per year in the Caribbean area. According to plaintiff, however, the contract encompassed an unlimited number of cruise days per year to any area where Costa Lines vessels sail.

Under such circumstances, there is no basis upon which the Court could order specific performance of this "contract." Indeed, there is in fact and in law, no legally enforceable "contract" when the parties have not established with certainty the terms and conditions of their agreement. Where the terms are this vague and indefinite, the Court has no basis upon which to ascertain even whether there has been a breach of the "contract" by either or both parties or in what amount the injured party may have suffered damages.

■■■ 6. The services rendered by plaintiff would have entitled him, absent the agreement which the Court has found to be unenforceable, to an award of salvage. The Court, therefore, will place the parties in the status quo ante and give plaintiff an amount representing the low to moderate order salvage services he rendered.

7. Since Murphy Pacific Corp., a professional salvage company, would have taken the job for $100,000.00 the Court finds this to be the maximum amount allowable for

the Captain's services. From this must be deducted the value of the cruises he has already taken. The Court finds that he has taken some 76 days of cruises with a value of $150.00 per day, for a total of $11,400.00.

8. The other factors which must be weighed in determining the amount of the salvage award are those enumerated in *The Blackwall*, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869). As to the labor expended, plaintiff was on board the Federico "C" intermittently throughout the operation, directing and coordinating the activities for three or four days. As to the promptitude, skill and energy displayed in rendering the services, the testimony is uncontroverted that Captain Jackson's services were skillful, professionally rendered and ultimately successful. There was no property employed by plaintiff in the salvage services; therefore, the value of such property and the danger to which it was exposed are not factors in this case. There was little, if any, risk incurred by plaintiff in salving the property, but the value of the T/S Federico "C" was given at $10 to $12 million. Lastly, though there was no immediate danger to the vessel when Captain Jackson came aboard, danger might have arisen at any moment during that season of the year, in the form of northerly storms.

9. In addition to the above considerations, it must be taken into account that the $100,000.00 for which the tug Cable would have assumed the salvage effort would not have represented all profit to Murphy Pacific, as the Cable's costs and expenses would have come from that $100,000.00. Captain Jackson did not have to make payments to a bank or finance institution on a vessel, nor did he have to pay union-scale wages and overtime for a crew, nor did he incur the heavy charges for specialized equipment that a salvage tug carries. Captain Jackson did not make any cash outlay to meet the maintenance charges on the vessel and equipment, neither did he have to pay social security, health insurance, or withholding for the crew, nor did he have to pay insurance toward liability, P & I, or hull coverage. In addition, he had no expenses for the fuel costs and food for the crew. To base Captain Jackson's salvage award on what the Cable would have charged without a deduction for the costs he would have incurred would result in a windfall to the plaintiff.

10. In consideration of all the foregoing factors, an award of $55,000.00 will fairly and equitably compensate plaintiff for his services. The Court, therefore, awards plaintiff $55,000.00 as salvage, and judgment will be entered accordingly.