## THE J. EMORY OWEN.

### (District Court, E. D. Wisconsin. April 11, 1904.)

1. SALVAGE—AWARD—DETERMINATION.

Where the need of salvage service is imminent, and the salvors are prompt and effective in giving their best efforts, without which the steamer and cargo saved would have been speedily destroyed, a liberal reward should be made, which, however, must be reasonably measured by all the circumstances, and not alone by the emergent need or the value of the saved property.

2. SAME.

Where a vessel was saved from speedy destruction by the acts of salvors, but at the time the service was rendered the vessel was not a derelict, the amount of salvage should not be determined by an application of the

---

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

See Salvage, vol. 43, Cent. Dig. § 57.

rules covering the apportionment of the value of a derelict saved; nor should the allowance equal what the owner, in the presence of the disaster, might offer for the rescue of the same.

**3. SAME—GOVERNMENT VESSELS.**

Where, after salvors had rendered services in extinguishing a fire on a vessel, a government steamer approached and rendered efficient services in the extinguishment of the fire, but made no claim for salvage by reason thereof, the value of the services of such steamer must be excluded in determining the salvage reasonably due to other vessels.

**4. SAME—EVIDENCE.**

Evidence reviewed, and *held* to authorize an allowance of $3,900 to two steamers for the saving of another steamer and cargo from destruction by fire, to be apportioned two-thirds to one and her crew, and one-third to the other and her crew.

**5. SAME—APPORTIONMENT.**

Where salvage earned by the saving of a vessel and cargo from destruction by fire was largely the result of the fire equipment of the vessels performing the service, and not from acts of heroism on the part of the crew, the amount of salvage should be apportioned two-thirds to the owners of the vessels, and one-third to the crew.

In Admiralty. Libels in rem filed by the owners, respectively, of steamers Ann Arbor No. 2 and Burnham, to recover salvage against the steamer J. Emory Owen and her salved cargo of grain.

C. E. Kremer, for the Ann Arbor No. 2.

M. C. Krause, for owners of the Burnham.

C. W. Noble, for crew of the Ann Arbor No. 2.

G. D. Van Dyke, for cargo of the Owen.

F. S. Masten, for the Owen.

SEAMAN, District Judge. The fact of meritorious salvage service is undisputed, and the general circumstances under which it was rendered and the measure of success in the venture are equally undisputed. The wooden steamer J. Emory Owen was bound down the lakes from Manitowoc, laden with about 100,000 bushels of barley and oats, early in the afternoon of December 5, 1903, when a fire started aft, and was speedily beyond control, disabling her engine, pumps, and steering gear. The burning steamer was then 8 or 10 miles southeasterly of the entrance to Sturgeon Bay Canal, and was discovered about the same time by the respective libelants' steamers, Ann Arbor No. 2 and George Burnham—the former on her course from the canal to Frankfort, and the latter bound for Milwaukee from Menominee, lumber laden. Each was prompt in starting for relief at full speed, and the ability and effort on the part of the Ann Arbor No. 2 in reaching the Owen and taking off the crew of 18 men are noteworthy. The Burnham arrived soon after the men were taken off. While the cabin and all aft of the iron boiler house were ablaze, and the master of the Owen expressed the belief that the vessel could not be saved, both steamers took positions to make the effort—the Ann Arbor No. 2 on the starboard, and the Burnham on the port side—with a light wind slightly over the starboard bow of the burning steamer. The Ann Arbor was well equipped for the service, with five steam pumps and hose (as a car and passenger ferry, 260 feet in length), while the Burnham was a freighter of 149 feet keel, with smaller pump and hose; but both

were served effectively with men placed on the decks of the Owen, and fire extinguishers were also used by the mate of the Burnham. The fire was partially subdued after working an hour or more, and the rescuing steamers proceeded with the Owen for the canal entrance; the Ann Arbor performing the main service therein, if not substantially all the towage, and each keeping the pumps at work, with streams of water on the fire below deck. When about a mile from the canal entrance, the government steamer Hyacinth came to assistance, with excellent fire apparatus and service, taking the place of the Burnham on the port side; sending men with her hose into the engine room of the Owen, where the fire was making forward. For this work the Owen was held outside the entrance about an hour, and then proceeded up the canal, with the Ann Arbor on the starboard, furnishing the motive and guiding power; the Hyacinth on the port side working her pumps; and the Burnham astern of the Owen, throwing some water, but hindering the progress of the tow. On reaching the landing place, near Sturgeon Bay, about 9 p. m., the Owen stranded. During the night, watch was kept by each of the salving steamers, and streams of water were thrown at times to quench fire, which still appeared in places, up to 9 or 10 a. m., when the fire was out, and no further service was required. The Ann Arbor and Burnham remained some time longer before proceeding on their respective voyages, but without cause, so far as concerned the salvage service. No salvage claim is presented, or probably allowable, on behalf of the Hyacinth, but the value of this service can neither be disregarded, nor counted in favor of the libelants.

The grain which comprised the cargo of the Owen was greatly damaged by water, but a representative of the insurers, taking prompt measures to that end, saved about 16,000 bushels. The cargo was then sold, upon bids, at Sturgeon Bay, for $10,600, after incurring $1,000 of expense in removal and care, so that the net recovery was $9,600. Contract was let for raising the steamer and delivering steamer and cargo at Milwaukee—"no cure no pay"—for $3,500, of which the agreed share to be borne by the cargo was $1,750, and the contract was duly performed. After arrival in Milwaukee the wreck was appraised, under order of court, at $12,000; and this valuation, less $1,750 for the expense of raising and delivery, is adopted as just for the purposes of the controversy, rejecting the opinion evidenced as to the value at Sturgeon Bay while grounded. The valuations thus adopted aggregate $19,850 for the salved property.

The amount which may justly be awarded for salvage depends upon numerous conditions, and the solution is never free from difficulty when meritorious service appears; and the present case is further complicated both by the unusual diversity of interests involved, and by the absence of well-defined precedents for apportionment under existing conditions of steam navigation on the Great Lakes. The general rules which govern the award are well settled and require no recapitulation. The need of salvage service was imminent, and the salvors were prompt and effective in giving their best efforts. Without such service the steamer and cargo were doomed to speedy destruction. A liberal reward, commensurate with their action in the emergency, is due, under all the authorities, by way of salvage allowance; but it must be reasonable,

measured by all the circumstances, and not alone by the emergent need for aid, nor the value of the saved property. The contention for an allowance equal to the share which an owner might offer, in the presence of the disaster, for rescue of his vessel or cargo from inevitable destruction, cannot receive sanction; and I am satisfied that the further contention that the case is one of derelict, and within the rule commonly applied in such instances, is untenable. The circumstances do not establish a derelict, in the strict sense of that term. The Hyderabad (D. C.) 11 Fed. 749, 755. And no just ground appears for an arbitrary apportionment of share as a derelict to the salvors.

Both steamers were speeded to the rescue on the instant of discovering the fire, with pumps and hose put in readiness for use; and this element is entitled to substantial recognition in the award, although indifference in such case would violate a common dictate of humanity. Another important element was the rescue of the crew, who were thus saved the hardship and possible perils of a long pull ashore in their yawl, which was in readiness; the weather being cold, though not stormy. The conclusion to stand by and attempt to put out the fire, notwithstanding the hopeless report of the master of the Owen, together with the excellent equipment of the salvors for that purpose, especially on the part of the Ann Arbor, are potent factors. I am satisfied that these means were well served by both, though the witnesses on behalf of each unite in attempted belittlement of such service on the part of the other steamer—a spirit which must be deplored, although not unprecedented in maritime cases. The important element of peril involved in the undertaking on the part of the salvors remains to be considered, and I am constrained to the view that neither the steamers and cargoes of the libelants, nor the men who served in fighting the fire, were at any stage placed in imminent peril; that the direction of the slight wind, and location of the fire, aft of the iron boiler house and cargo bulkheads, made it unnecessary to expose the steamers to serious danger; that the men engaged on the burning vessel were exposed to no more peril than is commonly met by the fire department on land, and made no venture into the hold, beyond the openings in the deck, nor was this attempt deemed necessary, so far as appears, until made by the men from the Hyacinth after entering the canal.

The circumstances thus stated present a salvage case of unquestionable merit, and the libelants are justly entitled to fair rewards for efficient and successful services, beyond a quantum meruit for the expenses, time, and use of means. I am of opinion, however, that no award should be made of aliquot share in the salved property or its value, under these findings, whatever sanction appears for such allowance in various decisions involving derelicts or other extreme conditions. While the value of the property saved enters into determination of the value of the salvage service, as an essential element, and the maritime law intends encouragement of gallantry and adventure in the relief of distressed vessels, it is not the policy of that law to grant awards which tend to excite greed or promote unreasonable pretensions on the part of salvors, nor to disregard in any measure the interests of the owner of the rescued property.

· The term of salvage service extended from about 2 p. m. to the morning of the next day, or less than one day. On the basis of expense and use of steamer and means, a mere quantum meruit al-· lowance would not probably exceed $300 for the Ann Arbor No. 2, and $130 for the Burnham; and I deem $500 a liberal estimate of the actual service engaged, including the Hyacinth. The service was rendered, however, in the month of December, with both steamers deviating from their voyage to render assistance. When the crew of the Owen were taken off, the only encouragement to further delay and effort was the mere possibility that joint and immediate use of their fire equipment might control the fire, with slight ground for expecting success, in view both of the destruction then raging, and of the master's judgment that it was beyond control. While serious peril was not involved in the attempt, the venture was doubtful, and, except for the excellent preparation made to that end on their run to the burning steamer, followed by good work, the steamer and cargo would have been a total loss. Considering these facts and the amount of the saving thus effected, my conclusion is that $4,000 is a just and adequate allowance by way of bonus for the aggregate salvage service, making the total estimate for such service, with the $500 estimate before mentioned, $4,500. In this amount I estimate the share of the service on the part of the Hyacinth at $600, which must be deducted from the aggregate so estimated, as the claimants are entitled to the benefit of such share, and not the libelants. The remaining sum of $3,900 is primarily apportioned two-thirds ($2,600) to the Ann Arbor and crew, and one-third ($1,300) to the Burnham and crew, as that is deemed the fair proportion· of one with the other, both in the capability of steamer and equipment, and in actual salvage service. Without disparagement of the worthy service of both, however, I am constrained to comment upon incidents which baldly appear in the testimony, and tend to show a spirit of selfishness and jealousy on the part of salvors, not deemed sufficient to influence the award, but so manifest that they cannot be passed over by silence. The true spirit and duty of this chivalrous service appear to have been misconceived by both· of the primary salvors in the objectionable features referred to, but the most flagrant violation was on the part of the Burnham (1) in the treatment of the Hyacinth when that steamer came to their aid·; and (2) in hooking on astern of the Owen during the difficult passage up the canal, hindering the tow, with little help, if any, in subduing the fire in that position. The minor (but notable) instances were (1) the exclusion of the master and men of the Owen from aiding in the work, when they came aboard presumably for that purpose, such treatment being plainly indicated by the conduct of the salvors throughout the service, and was forcibly expressed in at least one instance; and (2) persistence in exclusive watch and ward over the wreck, not only after grounding, but long after such service was needless. Whatever the incentive to either of the courses of con-.duct thus mentioned, each is disapproved, to say the least; and, if it had appeared that the result of the service was materially affected thereby, I should not have hesitated in reduction of the award. But

I am of opinion that the allowances stated are just, notwithstanding these deplorable incidents.

The difficult question which remains to be solved is the rightful share of the crews, respectively, in the general award. Within the purposes of the bounty and the principles of award, the apportionment between the owners of the steamer and her crew in any case must be governed by the circumstances of the particular service. As the circumstances are multifarious, so are the adjudicated cases, and I deem it unnecessary to review or analyze the numerous citations presented in the briefs. The era of steam navigation has revolutionized the means and methods of commerce—and the changed conditions are most evident on the Great Lakes—so that maritime rules have necessarily conformed to existing conditions. Salvage apportionments under the era of the sailing vessel and small tonnage are not now applicable as general precedents, and the later cases, if not entirely harmonious, are quite uniform in modifying the rulings thereupon of the earlier cases. In the case at bar the chief factors in the salvage service were the power and fire equipment of the steamers, and not individual heroism or potency. It is equally true that the services of the men were indispensable in extinguishing the fire, and that instances of salvage wherein difficult towage was the main ingredient are not analogous. I am satisfied, therefore, that the case is fairly within the line of authorities granting about two-thirds of the award to the owners and one-third to the crew, and so apportion to the libelant Ann Arbor Railroad Company, owner of Ann Arbor No. 2, $1,740, and to the libelants Adolph Green and Fred. Schwerman, owners of the Burnham, $870. The sum of $860 is awarded to master and crew of the Ann Arbor and apportioned in two parts: (1) $360 to constitute special awards, $100 to the master, $60 to the chief engineer, $40 to the assistant engineer, $50 to first mate, $40 to second mate, $25 to steward Hawley, $25 to waiter Cooper, and $20 to deckhand Morris; (2) the remaining $500 to be divided among the master and crew, each member receiving such share thereof as his rate of wages bears to the aggregate pay roll. The sum of $430, awarded to master and crew of the Burnham, is apportioned in two parts: (1) $180 in special awards, $60 to the master, $40 each to the engineer and mate, and $20 each to seamen Litzler and Green; (2) $250 to be divided among master and crew, each receiving such share as his rate of wages bears to the aggregate pay roll.

Let decree be prepared accordingly.