**ATLANTIC REFINING CO. v. MERRITT & CHAPMAN DERRICK & WRECKING CO. SAME v. PILOTS' ASS'N FOR THE BAY AND RIVER DELAWARE. PILOTS' ASS'N FOR THE BAY AND RIVER DELAWARE v. ATLANTIC REFINING CO.***

(Circuit Court of Appeals, Third Circuit. March 6, 1924. Rehearing Denied August 14, 1924.)

Nos. 3072, 3074.

**1. Salvage ⚖⇒32—$25,000 to wrecking company furnishing diver held not excessive.**

An allowance of $25,000 for salvage service rendered by a wrecking company, furnishing a skillful diving crew and equipment at a time when the services of a skillful diver were essential to save a ship and cargo valued at $2,250,000, held not excessive.

**2. Salvage ⚖⇒32—Allowance of $15,000 to association furnishing pilot boat held insufficient.**

An allowance of $15,000 salvage services rendered by a pilot association furnishing a pilot boat, which rendered the last act necessary to save a ship and cargo valued at $2,250,000, held too small, and allowance increased to $25,000.

**3. Salvage ⚖⇒24—Generally liberal award allowed.**

Generally a liberal award, that is, such an award as will encourage and stimulate similar service by others, commensurate with the salvage service rendered in the emergency, should be allowed.

**4. Salvage ⚖⇒26—Circumstances considered in fixing value of services.**

The circumstances entitled to most consideration in fixing the value of salvage services are value of property saved, extent of service rendered, degree of merit and gallantry displayed, and danger to which vessel was exposed; the order in which ingredients are mentioned being without significance.

On Rehearing.

**5. Salvage ⚖⇒15—Circumstances held to give master authority to protect wrecked cargo and to show implied request for diver's services.**

Circumstances held to give master of wrecked ship all authority necessary for protection and preservation of wrecked cargo, and to show implied request that diver perform services.

**6. Salvage ⚖⇒16—Remuneration proper where benefits received, whether contract was expressed or implied.**

Where owner of wrecked ship and cargo received benefit of diver's services, remuneration should be made, whether contract was expressed or implied.

Appeals from the District Court of the United States for the Eastern District of Pennsylvania; Charles L. McKeehan, Judge.

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 266 U. S. —, 45 Sup. Ct. 100, 69 L. Ed. —.

Separate libels by the Merritt & Chapman Derrick & Wrecking Company against the Atlantic Refining Company and by the Pilots' Association for Bay and River Delaware, owner of the Philadelphia, against the steamship Herbert L. Pratt and its cargo, the Atlantic Refining Company, owner and claimant, consolidated for trial. From a decree awarding the Merritt & Chapman Company $25,000, owner appeals. From a decree awarding the Pilots' Association $15,000, both parties appeal. Award to the Merritt & Chapman Company affirmed, and award to Pilots' Association increased to $25,000.

Howard M. Long, of Philadelphia, Pa., and Harrington Putnam, of New York City, for Atlantic Refining Co.

Duncan & Mount, of New York City, and Frederick W. Gourlay, of Philadelphia, Pa. (Warner Pyne and Dudley C. Smith, both of New York City, of counsel), for Merritt & Chapman.

Lewis, Adler & Laws, of Philadelphia, Pa. (Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for Pilots' Ass'n for the Bay and River Delaware.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

DAVIS, Circuit Judge. [1, 2] These three appeals were taken from decrees of the District Court awarding $25,000 to the Merritt & Chapman Derrick & Wrecking Company and $15,000 to the Pilots' Association for Bay and River Delaware, against the Atlantic Refining Company for salvage services rendered to the oil tanker Herbert L. Pratt, on June 3 and 4, 1918. The Refining Company appealed on the ground that the awards to the Merritt & Chapman Company and to the Pilots' Association were too large, and the Pilots' Association appealed on the ground that the award to it was too small.

At about 3:45 in the afternoon of June 3, 1918, the Pratt, loaded with a cargo of oil, bound from Tampico, Mexico, to Philadelphia, struck a submerged German mine about two miles southeast of the Over Falls Lightship and about three miles southeast of the Delaware Breakwater. The explosion tore a hole in one of the empty oil compartments in her port bow near the keel. She began to fill with water and her bow gradually settled until it rested on the bottom 1½ to 2 miles from the Over Falls Lightship in 13 fathoms of water. She then swung around with the tide until she headed southward. The sea was smooth, with a strong ebb tide. She had a draft of only 9 feet. As the bow settled, her stern was raised, and when she finally pivoted on her bow more than one-half of the vessel was submerged. She swung around with each tide settling about 3 feet with a tide.

It was apparent that she was in imminent danger, and something had to be done, and that speedily, if she and her cargo were to be saved. Fortunately Lieutenant Commander Walter M. Davis, U. S. N., was on duty on the U. S. S. Garner, in the vicinity of Cape Henlopen. He was at that time Lieutenant Commander in the Navy, but had up until a short time before been with the Merritt & Chapman Company for 26 years. Besides being a man of rare judgment and unusual ability, he had had a wide experience in just the kind of salvage service that

was required at that particular time to save the Pratt and her cargo. Fortunately, also, the U. S. S. Tasco, a combination mine layer, sweeper, and wrecker, on that day lay at the Naval Base Pier at Cape Henlopen with fires banked. There was also at Lewes, Del., the wrecking boat Superior, belonging to the Merritt & Chapman Company, which was equipped with a diving apparatus and crew. Connected with this crew was Carl Anderson, one of the best and most experienced divers in the United States, and his tender, Nick Remick. On that same day not far from there the pilot boat Philadelphia, owned and operated by the Pilots' Association, was cruising between the Breakwater and Over Falls Lightship in the immediate vicinity of where the Pratt was wrecked. Lieutenant Commander Davis, upon arriving at the Base Pier at Cape Henlopen at about 7 o'clock that evening, saw the stern of the Pratt standing high out of the water. He immediately secured permission from the Base Commander to undertake the salvage of the Pratt. He ordered the Tasco to go to the wreck as soon as possible, and sent a coastwise power boat to the Garner for some copper steam hose, which he thought might be needed, and went out himself to the Pratt. The opinion of the learned District Judge contains a graphic account of what was then done:

"He went aboard, looked the situation over, and decided on what should be done. This was that the Pratt must be lightened forward, by pumping out her cargo of oil until she recovered sufficient buoyancy to float. This involved several problems. The Pratt's engine and boilers were in the stern of the ship. There was five feet of water in the starboard fireroom, and no water in the boilers, which required fresh water to get up steam. About this time (10 p. m.) the Tasco arrived, made fast on the stern port quarter of the Pratt, and pumped fresh water into the Pratt's tanks, and about 11 p. m. steam was gotten up on the Pratt's port boiler. It was also evident that a diver would be needed to open certain valves on the submerged forward deck before the oil could be pumped out, and to lengthen a bent pipe, then submerged, which ran up close to the foremast, so as to give the pipe an opening above water. Returning to the base pier at midnight, Commander Davis called Anderson on the telephone and arranged with him to get his diving gear and party together and make ready to go to the wreck; Davis telling Anderson that he would be responsible to the wrecking company for the remuneration of Anderson and his assistants. He also telephoned to Mr. Gabriel, the manager of the Atlantic Refining Company's marine department, to send the required assistance to the vessel as soon as possible. Shortly afterwards the steam hose arrived from the Garner, and, having prepared one of the Pratt's lifeboats for use as a diving boat, and having loaded the diving gear and hose into it, Davis started for the Pratt, with the diving boat and diving party, about 3 a. m. The diving party consisted of Carl Anderson, an experienced and capable deep-sea diver, his tender, Nick Remick, and two or three other employees of the wrecking company. The blueprints of the Pratt were under water, so the Pratt's captain explained to Commander Davis and to Anderson the location of the valves that must be opened and the location of the vent pipe.

"About 5 a. m. Anderson went down, and after an hour and half work under water succeeded in opening the necessary valves. He went down again at 7:30 a. m. and made an effort to put an extension on the vent pipe, a difficult piece of work; but the tide was too strong, and he was compelled to desist for the time being. It was then found impossible to keep steam in the Pratt's boilers; so the copper steam hose, which Davis had previously ordered, was run from the Tasco to the Pratt, and preparations were made for the Tasco to supply the Pratt with steam for all purposes. Davis then returned to the base pier to make further arrangements for pipe fittings, fresh

water, etc., and at 11 a. m. returned to the wreck. He then sent Anderson down again, and the diver succeeded this time in fastening an extension to the vent pipe, which extended it above water. At 1 p. m. (June 4th) the Tasco began pumping the oil out of the Pratt's forward tanks. As the pumping proceeded, the Pratt began to list to starboard, and at 3 p. m. was listing heavily. All hands except Davis and the captain and chief engineer of the Pratt were ordered on board the Tasco, and life preservers were passed to the three officers who remained on the Pratt. Some of the Tasco's crew were stationed with axes to cut the grappling lines in case the Pratt turned over. These precautionary measures proved to be unnecessary, but they illustrate the situation as it appeared at the time to those who were on the scene and in charge. About 3:30 p. m. the Pratt was listing about 40 degrees, and the captain and chief engineer protested to Commander Davis against further pumping unless the valves on the port side were closed, thus preventing the cargo of oil from flowing to starboard. It seemed impossible to close these valves, and apparently also Commander Davis considered this step inadvisable. At any rate, he continued pumping and told the Pratt's captain that he would accept the responsibility.

"At this juncture the pilot boat appeared on the scene. On the previous day she had run over to the Pratt and brought some of her crew to Lewes, and had spent June 4th in cruising over her regular cruising ground close by. In the afternoon she again steamed over to the Pratt, arriving there about 3:40 p. m. A 4½-inch line was secured from the Tasco; one end was fastened to the stern of the Pratt and the other end to the towing bitts of the pilot boat, which then began tugging astern. Meantime the pumping continued. In 10 or 15 minutes the Pratt's bow began to raise and she began to right herself.. The pilot boat then started to tow her stern first towards shallow water. As the pumping continued, the Pratt's bow raised until there was only one foot of water on the forward deck. About this time the towline, an old one, parted, and a new line was hauled from below on the Pratt and given to the pilot boat. All the Pratt's crew now returned on board from the Tasco and started to get up steam in the Pratt's boilers. Commander Davis then decided to take the ship to the breakwater, so the pilot boat was shifted to towing ahead, and with the Tasco still lashed alongside the Pratt, she towed her in under the outer breakwater, where she was grounded in 40 feet of water about 7:30 p. m. Commander Davis then left with the Tasco and returned to the base pier. A few days later, the Pratt proceeded to Philadelphia Navy Yard under her own steam and went into dry dock."

The saving of the Pratt and her cargo was the result of four principal factors—Lieutenant Commander Davis, The Tasco, Carl Anderson, and the pilot boat Philadelphia. The questions before us are the value of the salvage services rendered by Anderson and his helpers and the Philadelphia, there being no question as to the remuneration of Commander Davis and the Tasco.

[3] The amount which may be justly awarded for salvage service depends upon numerous conditions, and the solution is never free from difficulty when meritorious service appears. In this case the difficulty is complicated by the absence of well-defined precedents, at least, so far as concerns the services of Anderson. A general rule is that a liberal award commensurate with the service rendered in the emergency should be allowed, such an award as will encourage and stimulate similar service by others. The Baker (C. C.) 25 Fed. 771.

[4] The circumstances entitled to most consideration in all cases are: The value of the property saved, the extent of the service rendered, the degree of merit and gallantry displayed, and the danger to which the vessel was exposed and from which it was saved. The J. Emory Owen (D. C.) 128 Fed. 996; The Emulous, 8 Fed. Cas. p.

704, No. 4,480; The Mt. Washington, 17 Fed. Cas. p. 925, No. 9,887; The Blackwall, 77 U. S. (10 Wall.) 1, 18, 19 L. Ed. 870. It is morally certain that without Anderson, or some equally skillful diver, the result could not have been accomplished. Anderson is reputed to be one of the most skillful divers in the United States. Commander Davis said:

"I wanted a diver that could, first, locate himself under the water; and, second, handle himself, and I thought that the best was none too good, and that is why I got Anderson."

His services were absolutely indispensable. It was admitted at the argument that the reasonable value of the Pratt and her cargo was $2,250,000. $25,000 is only 1¹/₉ per cent. of that value. When the value of the vessel is considered, the impending danger to which it was exposed, the loss from which it was saved, and the unique character of Anderson's services, $25,000 is the minimum recompense that should have been awarded to the Merritt & Chapman Company.

When the Philadelphia arrived, about 3:40 in the afternoon, the imminent and impending danger of the Pratt and her cargo cannot be overstated. She was liable to capsize or buckle any minute, and so far as can be determined the service rendered by the Philadelphia was the last necessary act which prevented a total loss. Without intending to compare the value of the service rendered by Anderson with the award for which the Merritt & Chapman Company seem satisfied, and the Philadelphia, we are of the opinion that the award for her services was too small, and that it should have been $25,000.

At the argument we were disturbed by the fact that the Pilot's association in this case did not have a record adequate for the consideration of a meritorious appeal. It had refused to enter into an agreement with counsel for the appellee to bear an equitable proportion of the expense of printing the record of the trial in the District Court. But since the argument the appellant has paid to the appellee one-half of the cost of printing the record, which in accordance with our statement at and before the hearing, made the record available for both sides.

It follows that the decree in the case of Atlantic Refining Company v. Merritt & Chapman Company is affirmed, with costs; the appeal in the case of Atlantic Refining Company v. Pilots' Association is dismissed, and the decree in the case of the Pilots' Association for Bay and River Delaware v. Atlantic Refining Company is reversed and a decree awarding $25,000 to the appellant will be entered with costs.

## On Petition for Rehearing.

PER CURIAM. In discussing in our opinion filed in this cause the circumstances to be considered in making awards for salvage service we mentioned the ingredients:

"The value of the property saved, the extent of the service rendered, the degree of merit and gallantry displayed, and the danger to which the vessel was exposed and from which it was saved."

Counsel for the Refining Company concluded from the above statement that we had meant to arrange these elements in the order of

their importance, and so filed a petition for a rehearing, in which they contend too great emphasis was laid on the value of the salved property because it was mentioned first. They quote the following from the case of The Clifton, 3 Hagg. 121, and from the text-book of Marvin on Wreck and Salvage as the proper order of the ingredients of awards:

"First, enterprise in the salvers, as going out in tempestuous weather, risking their own lives to save their fellow creatures, and to rescue the property of their fellow subjects; secondly, the degree of danger and distress from which the properties rescued, whether it were in imminent peril, and almost certainly lost if not at the time rescued and preserved; thirdly, the degree of labor and skill which the salvors incur and display and the time occupied. Lastly, the value."

But another standard text-book says:

"The right to salvage depends upon the saving of the property; but the rate or amount of salvage depends upon the amount of the property, the probability of loss, the amount of peril to the property, the value of the service to the owner of the property, and the personal toil, loss of time, daring, and danger of the salvors. * * * The highest order of merit, in a pecuniary estimate, is the safe bringing in of property entirely abandoned and lost to the owner." Section 224, Benedict's Admiralty.

The Supreme Court, speaking through Mr. Justice Clifford, in the case of The Blackwall, 77 U. S. (10 Wall.) 1, 14 (19 L. Ed. 870), said that courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the award:

"(1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

But Mr. Justice Story, in speaking on the same subject, said:

"The circumstances entitled to most consideration in all cases of salvage are, the value of the property saved; the extent of the labor and services; and the degree of merit and gallantry in accomplishing the enterprise." The Emulous, 8 Fed. Cas. p. 704, No. 4,480.

In the case of Post et al. v. Jones et al., 60 U. S. (19 How.) 150, 161 (15 L. Ed. 618), Mr. Justice Grier, speaking for the court, said that the ingredients to be considered in making the award are:

"Danger to property, value, risk of life, skill, labor, and the duration of the service."

This is a different order from that given by the same court in The Blackwall, supra, and from that given in the Clifton, and in Benedict, supra. The conclusion to be deduced from these facts is that in considering the various ingredients which enter into the amount of salvage to be awarded, there is no special significance to be attached to the order in which they are mentioned. The amount of the award, determined by emphasis being laid sometimes on one ingredient and sometimes on another, "is largely a matter of fact and discretion, which cannot be reduced to precise rules, but depends upon a consideration

of all the circumstances of each case." The Connemara, 108 U. S. 353, 359, 2 Sup. Ct. 754, 27 L. Ed. 751; Peisch v. Ware, 4 U. S. (4 Cranch.) 347, 364, 2 L. Ed. 643. In mentioning the ingredients above we did not intend to declare a rule of law as to which ingredient was entitled to most consideration in any particular case. The order in which they are mentioned is without significance.

The service rendered by the pilot boat Philadelphia was not a mere towage service. The Pratt lay in a mine field, known to be very dangerous. Besides, when the Philadelphia arrived, the Pratt was about to capsize and the service rendered her by the Philadelphia at the particular time was the last efficient cause which prevented a total loss. The service of towing the Pratt to the outer breakwater was inconsiderable, but the service rendered under the circumstances, in raising the Pratt and preventing a total loss of the boat and her cargo, was the real ground of the award to that boat.

[5, 6] The libel of the Merritt & Chapman Company is in personam and not in rem. The respondent contends that it cannot be maintained because there was no request by respondent for the service rendered, "No assumpsit shown." In the circumstances under which the services were rendered by Anderson, the diver, the master of the ship became the agent of the respondent and was clothed with authority to do everything reasonably necessary for the protection and preservation of the boat and her cargo. 36 Cyc. 123. The testimony shows that Capt. Davis told the master that Anderson "was the best diver," and he would make an effort to get him. He was secured and he, with Captain Davis, worked with the master to save the Pratt and her cargo until they did so. Under these circumstances, a request from the master to Anderson is implied, if it was not actually expressed. Having thus received the benefit of the service, remuneration should be made whether the contract was express or implied. United States v. Morgan, 99 Fed. 570, 572, 39 L. Ed. 653; Hartford & N. Y. Transportation Co. v. United States (C. C.) 138 Fed. 618; United States v. Cornell Steamboat Co., 202 U. S. 184, 190, 26 Sup. Ct. 648, 50 L. Ed. 987.

After carefully considering the petition, we are satisfied that the awards are just, and a rehearing is denied.