### THE BLACKWALL.

1. A libel for salvage may be filed in the name of the master and owners of the salving vessel, although the master may make no claim in his own behalf, but, contrariwise, may disclaim.

2. A tug towing, under the direction of the fire department of a city, fire engines commonly used on land, from a wharf, into a harbor where a vessel is on fire, and laying alongside of the burning vessel while the engines throw water upon her, is entitled to salvage, the fire being successfully extinguished.

3. The owners of the tug will not be deprived of salvage because the representatives of the fire department have not made a claim as co-salvors.

4. A vessel owned by a corporation may be entitled to salvage, the vessel being otherwise a salvor. *The Camanche* (8 Wallace, 476) affirmed on this point.

5. One-twentieth part of the value of the property saved allowed to a tug carrying fire engines, and laying beside a burning vessel while the engines, under the management of the fire department of the town, worked them and extinguished the fire. This reversed a decree which had allowed a tenth for her salvage service; the fire department having presented no claim; no allowance having been made to *it;* and the tenth allowed having apparently been an allowance for the whole salvage service.

6. Non-prosecution of their claim by one set of salvors, enures to the benefit of the owners of the vessel, and not to that of other salvors who do prosecute *their* claim.

APPEAL from the Circuit Court of the United States for California; the case as it appeared from the opinion of the District Court, from which it had been taken to the court below was this:

About 4 o'clock on the morning of the 24th of August, 1867, the British ship Blackwall, then at anchor in the harbor of San Francisco, was discovered to be on fire. Shortly afterwards the alarm was communicated to the shore, and the fire department of the city called out. As soon as the cause of the alarm was ascertained, the chief engineer of the fire department, with an officer of the harbor police, proceeded to the steam-tug Goliah, then lying at one of the city's wharves, and belonging to an incorporated towing company of San Francisco, and having aroused the person in charge, requested him to "fire up" without delay, in order that the engines might be conveyed on the tug to the burning vessel. This, after a few moments' hesitation, arising it was plain from reluctance to act without orders, he proceeded to do. Messengers were despatched to the captain and engineer of the tug, who were asleep at their homes on shore, and every effort made to get steam on the tug as quickly as possible. The captain and engineer were aroused, and at once repaired to the wharf. It being found impracticable for the tug to go into the slip where the fire engines lay, two of the latter were brought around to the wharf where the tug was, and taken across the deck of a steamboat which lay between the wharf and the tug, and so on to the tug with promptitude and skill. About 6 o'clock the tug, with two engines on board, together with the firemen, &c., attached to them, moved from the wharf, and in a few minutes were alongside the ship. The fire had by this time made considerable progress. The house on deck between the fore and mizzen masts was on fire, and the flames were mounting nearly half way to the tops. The ship was also burning between decks, where the fire first originated. The officers and crew, though assisted by a party from the United States ship Lawrence, *having found all attempts to subdue the flames abortive, had desisted from further efforts, and had a few moments before the Goliah arrived, left the vessel with their effects in small boats.* Without speedy assistance the total destruction of the ship and cargo was inevitable. The measures of the firemen and officers of the tug were taken with great

skill and energy. The hose of the engines was charged, as the tug approached the vessel, and as soon as she was near enough, four streams were directed upon her. The tug, without hesitation or delay, was made fast alongside the Blackwall. The firemen almost instantly mounted her rails, went thence to her forecastle, and from thence to her deck, sweeping the latter with four powerful streams, by which the fire was speedily controlled. They then descended to her between decks, and in a little more than half an hour the flames were entirely extinguished. Her anchor was then weighed by the advice of the captain of the tug, and the vessel was towed to certain flats near one of the city's wharves. The tug was then dismissed, and the engines were taken to the shore and landed.

As to the degree of danger incurred by the tug there was some conflict of testimony. That she was promptly and boldly laid alongside the burning vessel was undisputed. That she caught fire once or twice was proved, although this fire was instantly extinguished, and with the powerful appliances she had on board the danger from this cause was perhaps not great.

The chief risk incurred by her was from the falling of the masts or spars of the vessel. An accident of this kind, had it occurred, might have proved disastrous to the tug, and perhaps to many on board. The danger was not supposed to arise from the burning of the shrouds, for they were of wire, but from the fact of the mast seeming consumed by the fire, which had been burning between decks for several hours. As a matter of fact, it was found on subsequent examination that the mast was but little burnt, and was in no danger of falling. And the chief engineer of the fire department testified that he became convinced very soon after getting on board, that all fears of the masts falling were groundless. These fears were, however, entertained and expressed, not only by the officers of the tug, but by the pilot, and by the mate of the ship, so much so that axes were got in readiness to cut away the shrouds on the portside of the vessel, in order that the mast might fall to the other side.

It is also to be observed that the tug encountered the risk of the possible existence of explosive substances on board the vessel, and also, though this risk was slight, that of her own machinery or that of the fire engines becoming unserviceable, while she lay alongside the vessel.

The tug, however, was not the sole salvor. Without her assistance indeed the fire engines would have been powerless to save the ship, but without these engines on the other hand, the tug's aid would have been just as ineffectual.

In this state of facts the towing corporation, which was owner of the tug, *and* one Clark, her master, filed a libel against the ship and cargo, in the District Court at San Francisco, for salvage. The libel alleged that the ship was on fire; that the cargo as well as the ship was in great danger, and that both would have been destroyed had it not been for the exertions of the steamtug, her master and crew; that the master and crew went with the steamtug to the assistance of the ship, and that they succeeded, after great trouble and great risk to the tug, in quelling and subduing the flames, and that they then towed the ship to a place of safety. *The fire department was no party to the libel:* and in his testimony the master stated that his name was used in the libel only for the company owning the tug, and that he himself claimed no interest. The value of the ship and cargo, so far as saved, was $100,000; the value of the tug about $50,000. The District Court decreed "that libellants do have and recover of the claimants $10,000 with their costs;" and this decree having been affirmed in the Circuit Court, the owners of the Blackwall now appealed to this court.

*Mr. Goodrich for the appellant :*

1. Clark having no interest, and having in fact disclaimed, cannot maintain suit for others, either in his own name or jointly with those in whom the interest may be. There is in fact a misjoinder; and the libel should be dismissed. The general rule of law and equity about parties must apply to admiralty cases.

2. The owners of the tug in their libel, aver that the boat,

its master and crew performed the entire salvage service. They must prove this, or the libel, not having been amended or reformed, should on this ground also be dismissed. But they cannot prove it. The fire department did much more than the tug. Even if the owners of the tug were co-salvors, they do not aver themselves to have been so, and therefore, they cannot recover as such. The issue presented by the pleading is an entirety of service rendered by the libellants, when in fact only a slight proportion thereof was rendered by the steamtug; the value of this proportion is not distinctly in issue, and there is nothing before the court by which it can be apportioned.*

3. The service by which the fire was extinguished was performed by the fire department of San Francisco, in the discharge of its public official duties. The vessel was in a position to be under the surveillance of the harbor police, by one of which the fire was discovered. The engineer of the fire department seized upon the tug (no resistance or objection being made), and used the same for the transportation of his engines and men, with and by which the service and extinguishment of the fire was accomplished. No compensation by way of salvage could be made to the fire department if it made a claim for it. But it made none originally; and it has never asked, nor does it now ask for a proportion of the money in the registry. The reason for this is obvious. It is that all persons who are under any legal obligation, express or implied, to render assistance, are not entitled to salvage.† The fire department of San Francisco is, of course, paid by the city.

4. The decree of the district judge, affirmed by the Circuit Court, is joint in favor of the master and owners of the tug, and cannot be sustained, unless both make claim and are entitled to recover. The master disclaims. This objection is,

---

* Malcomson v. Clayton, 13 Moore, Privy Council, 198, 206; Zugasti v. Lamer, 12 Id. 331, 338; Orne v. Townsend, 4 Mason, 541; The Sarah Ann, 2 Sumner, 206; The Towan, 2 W. Robinson, 259; The Neptune, 1 Id. 302; The Princess Alice, 3 Id. 142.

† Conkling, Admiralty Jurisdiction, 274.

indeed, included in the first one. So far as to preliminary objections.

But others remain.

A party not actually occupied in effecting a salvage service, is not entitled to share in a salvage remuneration. There is indeed an exception to this rule in favor of owners of vessels, which, in rendering assistance, have either been diverted from their proper employment or have experienced a special mischief, occasioning to the owners some inconvenience and loss, for which an equitable compensation may reasonably be claimed.* But the libellants were incorporated for the pur. pose of owning and using boats for a towage service, and do not come within the terms or reasons of the exception from the general rule. The company is entitled to a fair compensation, a *quantum meruit* for its work and labor done. But clearly the sum of ten thousand dollars exceeds an equitable compensation for the service performed by the tug. Indeed the sum has not been allowed as such; for—

It is evident that the sum decreed as compensation for salvage includes the entire service, which was rendered by the fire department, as well as the transportation service of the tug.

*Messrs. H. A. and J. S. Wise, contra :*

1. Clark asserts his claim as a master and salvor. Whether his claim, which he asserts as a salvor, is to enure eventually to his benefit or not, is unimportant. It is asserted in the libel, and the decrees support it, they being joint for company and Clark. Opposite counsel need not exercise themselves as to the proportion due respectively to company as owners, and Clark as master. The decree is sufficiently certain to be good, as against *them*. The counsel will settle the respective proportions of company and Clark satisfactorily to the parties concerned, or they can have the proportions ascertained by the court. This disposes of the objection both to the form of the libel and to that of the decree.

---

* The Vine, 2 Haggard, 1, 2; The Charlotte, 3 W. Robinson, 72.

2. The allegation of the libel as to what the steamtug did is in form; and is essentially true. The libellants were not bound to allege all the subsidiary, collateral, and instrumental aids that assisted to produce the fortunate result.

3. The service by which the fire was extinguished, was not performed by the fire department alone. How could land-engines have got to the ship, if the tug had not taken them there? How could they have been used with effect if they had not remained on the tug? The tug did a great share of what was done. Indeed no towboat ever performed a more novel, skilful, and efficient feat than did this towboat.

4. The only question then is, was the tug a salvor? A salvor is one who, without any particular relation to a vessel in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of the vessel.* Now the tug performed this exact kind of service. She was under no pre-existing contract, or in any particular relation to the vessel which made it her duty to risk her own safety in saving her. The engineer of the fire department had no right to seize her, nor did he seize her. Her service was voluntary and cheerful. It was bold also; and it was successful. Whether or not the fire department rendered any salvage service or not we need not inquire, for *they* make no claim.

5. The objection that the vessel was owned by a corporation, and that its owners rendered no personal service, is the same objection that was made by Mr. Ward at the bar, in *The Camanche*, conclusively answered by Mr. Casserly, opposing counsel, and overruled by this court.

6. *As to the amount awarded.* Plainly the decree is not meant to enure in any way to the benefit of the fire department, which makes no claim, and *never has made* any, for the reason (among others) stated on the other side, that it is paid by the city.

Then was the amount excessive for the tug alone? The

---

* The Wave, 2 Paine, 131.

ship was *derelict.* That is an immense feature in every case. The proportion for derelicts is from one-third to one-half.*

In *The Baltimore,*† £800 out of £1900 was awarded. This would give *us* upwards of $40,000. In *The Aid,*‡ a tenth was allowed to boats. In *The Albion*§ nearly a fourth, and costs. A fifth in *The Branken Moor,*‖ a case in which the court said that the underwriters would not have underwritten for 50 per cent. In our case they would not have underwritten for 75. See also *The Medora,*¶ which was a case of mere towage, where £600 was allowed. In the case of a derelict where a claimant appears, generally from a third to a half is allowed. The modern cases give about a third.** But in the case of *Jonge Bastiaan,*†† two-thirds were allowed. See also *The Isabella,*‡‡ which is a strong case; and *The Thetis,*§§ where expenses, £29,000 out of £157,000 were allowed. These cases make allowances far in excess of the allowance made below, and that too, where the destruction of the property was not so certain.

In addition, this court declared in *The Camanche,*‖‖ that it would not reverse a decree in salvage on the matter of amount, "unless for clear mistake or *gross* over-allowance."

Mr. Justice CLIFFORD delivered the opinion of the court.

Salvage is claimed by the libellants, as owners of the steamtug Goliah, for services renderd by the steamtug, her master and crew, on the twenty-fourth of August, 1867, in saving the ship Blackwall and her cargo, then lying at anchor in the harbor of San Francisco. They allege that the ship was on fire; that the cargo as well as the ship was in great danger, and that both would have been destroyed had it not been for the exertions of the steamtug, her master and crew; that the master and crew went with the steamtug to the

---

\* Rowe and others *v.* Brig ——, 1 Mason, 377; Hindry *v.* Priscilla, Bee, 1; L'Esperance, 1 Dodson, 46.

† 2 Dodson, 136.    ‡ 1 Haggard, 84.    § 3 Id. 255.    ‖ Id. 373.

¶ 2 W. Robinson, 69. ** The Thetis, 2 Knapp, 410.

†† 5 Robinson, 287.    ‡‡ 2 Robinson, 43.

§§ 3 Haggard, 14; 2 Knapp, 408.                ‖‖ 8 Wallace, 478.

assistance of the ship, and that they succeeded, after great trouble and great risk to the tug, in quelling and subduing the flames, and that they then towed the ship to a place of safety.

Information that the ship was on fire was communicated to the master of the steamtug by one of the deck-hands of the tug, and he went immediately to the slip where she was lying, in order to give directions to the men on board to kindle up the fires and put on steam; but he found, on arriving there, that one of the harbor police had been there before him, and that he had made a similar request, and that the firemen of the tug had started the fires for the purpose of putting on steam.

Two persons were sent to the ship, which was lying at anchor in the harbor, some seven or eight hundred yards from the wharves, to see if there was any chance to extinguish the flames, and they reported that the ship might be saved. She was an English ship of twelve hundred tons burden, and she was ready to sail for her port of destination with a cargo consisting of thirty-eight thousand five hundred and one sacks of wheat, valued at sixty-thousand dollars, and she was lying at anchor where the water was eight or ten fathoms in depth. They discovered the fire at four o'clock in the morning, and at six o'clock, or a quarter past that hour, they proceeded to the ship in the steamtug, having previously taken on board two steam fire-engines, each weighing five tons, with the engineer and several firemen belonging to each engine, and the chief engineer of the fire department, making twenty persons, including the master and crew of the steamtug. Both engines were well supplied with hose, and they had on board a considerable supply of fresh water. When the steamtug reached the ship those on board had become discouraged, and there were ten or twelve boats around the ship taking off the crew, but the boats were utterly unable to do anything towards extinguishing the fire.

Commanded, as all on board the steamtug were, by her master, their first act, after running alongside, was to fasten a stern-line to the main-chains of the ship, so as to lie across

the tide on the port side of the ship. At that time the fire seemed to be between decks, but the houses of the ship on deck were also on fire. Great apprehension was felt lest the foremast should fall, as it was on fire between decks, and the flames had extended to the deck and twenty feet up the mast. Her bulwarks were also on fire, and the master of the tug deemed it necessary to cut away the port-rigging attached to that mast to prevent it from falling across the steamtug. They put the engines in operation promptly, putting four streams of water on to the ship, and by those means extinguished the fire in an hour, the firemen working the engines under the command of their respective engineers. Some of the persons present advised the master of the steamtug to unshackle and slip the anchor; but he insisted that it could be saved, and it was hoisted on board the ship by the windlass.

Promptness and efficiency characterized the conduct of all engaged in performing the service throughout the transaction, and the steamtug, as soon as the fire was subdued and extinguished, took the ship in tow and proceeded with her to the adjacent flats, and left her there in safety in charge of her master and crew.

I. Certain preliminary objections are made by the appellants to the maintenance of the suit, which will be first considered before proceeding to examine the merits. Those objections are as follows: (1.) That the master, having no interest in the claim, is improperly joined in the suit. (2.) That the libellants have no just claim to compensation, as the salvage service was performed by the members of the fire department. (3.) That the service having been performed by the members of the fire department, in pursuance of a public duty, they are not entitled to any compensation as salvage. (4.) That the decree, inasmuch as it is joint, in favor of the master as well as the owners of the steamtug, is erroneous, because the master makes no claim to recover any compensation for his services.

1. Salvage suits are frequently promoted by the master

alone, in behalf of himself and the owners and crew, or in behalf of the owners and crew, or the owners alone, without making any claim in his own behalf, and the practice has never led to any practical difficulty, as the whole subject, in case of controversy, is within the control of the court. Much examination was given to the question as to proper parties, in a salvage suit decided at the last term, in a case where the owners of the steamer rendering the service were an incorporated company, and by reference to the authorities cited in the opinion of the court in that case it will be found that the suit is frequently promoted in the name of the master, or of the company and master, as in this case.*

Many other cases of like import might be referred to, but it must suffice to say that the court is of the opinion that the suit is well brought.†

2. Service undoubtedly was performed by the members of the fire department; but it is a mistake to suppose that service was not also performed by the steamtug, as it is clear that without the aid of the steamtug and the services of her master and crew the members of the fire company would never have been able to reach the ship with their engines and necessary apparatus, or to have subdued the flames and extinguished the fire. Useful services of any kind rendered to a vessel or her cargo, exposed to any impending danger and imminent peril of loss or damage, may entitle those who render such services to salvage reward.

Persons assisting to extinguish a fire on board a ship, or assisting to tow a ship from a dock where she is in imminent danger of catching fire, are as much entitled to salvage compensation as persons who render assistance to prevent a ship from being wrecked, or in securing a wreck, or protecting the cargo of a stranded vessel.‡

---

* The Camanche, 8 Wallace, 470.

† The Commander-in-Chief, 1 Wallace, 51; Houseman v. The Schooner North Carolina, 15 Peters, 49; The Propeller Commerce, 1 Black, 574; McKinlay v. Morrish, 21 Howard, 343; 2 Parsons on Shipping, 370.

‡ The Rosalie, 1 Spink, 188; Eastern Monarch, Lushington, 81; The Tees, Ib. 505; Williams & Bruce, Admiralty Practice, 92.

Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea, or in recovering such property from actual loss, as in cases of shipwreck, derelict, or recapture. Success is essential to the claim; as if the property is not saved, or if it perish, or in case of capture if it is not retaken, no compensation can be allowed. More than one set of salvors, however, may contribute to the result, and in such cases all who engaged in the enterprise and materially contributed to the saving of the property, are entitled to share in the reward which the law allows for such meritorious service, and in proportion to the nature, duration, risk, and value of the service rendered.*

Salvors are not deprived of a remedy because another set of salvors neglect or refuse to join in the suit, nor will such neglect or refusal benefit the libellants by giving them any claim to a larger compensation, as the non-prosecution by one set of salvors enures, not to the libellants prosecuting the claim, but to the owners of the property saved.†

Cases may also be found where co-salvors who neglected to appear and become parties to the suit until the decree was pronounced, were allowed to petition the court for such compensation out of the fund in the registry of the court, and where their claim received a favorable adjudication.‡

3. Important service unquestionably was performed by the members of the fire department, but as they are not parties to this suit it is not necessary to determine whether they would, under the circumstances of this case, be entitled to a salvage reward. Pilots, under some circumstances, may become salvors, and cases may be imagined where firemen perhaps might come within the same rule, but the question not being before the court no opinion is expressed upon the subject.

---

* Norris *v.* Island City, 1 Clifford, 220 ; The Bartley, Swabey, 198 ; Pride of Canada, Browning & Lushington, 209 ; 2 Parsons on Shipping, 279.

† Ship Charles Newberry, 329 ; 2 Parsons on Shipping, 301.

‡ Henry Ewbank, 1 Sumner, 400 ; Roberts on Admiralty, 85 ; The Camanche, 8 Wallace, 476.

4. Comment upon the form of the decree is unnecessary, as it has already been determined that the joinder of the master with the owners of the ship was not error for which the decree should be reversed, as the distribution of the fund is within the control of the court. Exceptions of the kind, if the claimant intends to rely on the same, should be made in the District Court, where the pleadings may be amended.*

5. Objection is also made that the owners of a vessel cannot promote a salvage suit unless they participate in the salvage service; or if they may promote such a suit, that they cannot participate in the reward decreed for the salvage service except for the risk and damage to which their property was exposed in rendering the salvage service. Such an objection was made in the case of *The Camanche*, before cited, but the court overruled the objection, and that ruling is adopted and applied in this case.

Beyond doubt remuneration for salvage service is awarded to the owners of vessels on account of the danger to which the service exposes their property, and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings, but it is not admitted that the amount of the allowance must be reduced on that ground. Corporations, as the owners of vessels, whether sail-vessels or steamers, may promote a salvage suit, and it makes no difference in that respect whether they were present or absent, provided it appears that the vessel employed was well manned and equipped for the service.†

II. Nothing remains to be considered but the question whether the amount awarded in the court below to the libellants was correct. Steam vessels are always considered as entitled to a liberal reward, not only because the service is usually rendered by a costly instrumentality, but because the service is in general rendered with greater promptitude and is of a more effectual character. Courts of admiralty usually consider the following circumstances as the main ingredients

---

* The Camanche, 8 Wallace, 476.

† Island City, 1 Black, 121; S. C., 1 Clifford, 210, 219, 221; Roberts's Admiralty, 104.

in determining the amount of the reward to be decreed for a salvage service : (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a *quantum meruit*, or as a remuneration PRO OPERE ET LABORE, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property.*

Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation.†

Minute description of the circumstances attending the service rendered by the libellants is given in the opinion of the district judge, which is exhibited in full in the record, and we refer to that as a satisfactory statement of all the material facts in the case, and we concur with him in the conclusion, that without speedy assistance the total destruction of the ship and cargo was inevitable; that the measures for relief taken by the officers of the steamtug, and by the firemen, were characterized by great skill and energy, but the repetition of the details of those measures beyond what has already been stated, is unnecessary. Suffice it to say the flames were extinguished in an hour or less, and the property to the value of one hundred thousand dollars, including vessel and cargo, was saved. Success attended their efforts, and it is evident that the services were in a high de-

---

* Williams & Bruce, Admiralty Practice, 116 ; 2 Parsons on Shipping, 292.
† Island City, 1 Clifford, 228.

gree meritorious, as a total loss of the ship and cargo must have been the consequence of any considerable additional delay. Those who embarked in the enterprise incurred considerable danger from the fire, in laying alongside of the burning vessel, and also from the risk that the mast would fall in consequence of the fire between decks. Dangers of the kind were apparent, and there were others apprehended which proved not to be real.

Viewed in the light of all the circumstances, as they are exhibited in the record, our conclusion is that the amount allowed is no more than a just salvage compensation for the entire service performed by the firemen and the steamtug, her officers and crew, but it must be remembered that the libellants, to wit, the steamtug, her officers and crew, were not the sole salvors, and it is clear that the sum decreed is for the whole service. Whether the fire department might or might not have been joined in the libel is not a question in this case. They were not made parties to the libel, and consequently their claim, if any, was not before the court, and the decree must be reversed on that ground.

Our conclusion is that a moiety of the amount allowed as salvage belongs to the libellants, and we express no opinion whether the other moiety may or may not be claimed by the fire department; but if not, then it enures to the ship-owners.

DECREE REVERSED, and the cause REMANDED, with directions to enter a decree for the libellants in the sum of five thousand dollars, with costs, in the District and Circuit Courts, and with interest from the date of the former decree.

