## THE BRINTON.

**Petition of PENNSYLVANIA R. CO., with five separate libels.**

District Court, E. D. New York. July 31, 1929.

Nos. 8613–8615, 8617, 8816, 9307.

544

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for petitioner.

William F. Purdy, of New York City, for libelant and for claimants B. McLain Transportation, Inc., Grace J. Dennin, and Anthony O'Boyle.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for the Burns Bros. No. 92.

Leo J. Curren, of New York City, for claimant James McWilliams Blue Line, Inc., the Blue Coat and effects of her master, Joaquin Rene, and the Blue Haven and effects of her master, Peter Begor.

Park, Mattison & Lynch, of New York City, for receivers of McWilliams Bros., Inc.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for the Red Star No. 38.

Arthur H. Haaren, of New York City (Warner Pyne, of New York City, of counsel), for claimants City of Long Beach and Long Beach-on-the-Ocean, Inc.

Macklin, Brown, Lenahan & Speer, of New York City, for claimants John J. Hammond and Keeler Transportation Line, Inc., and the L. T. No. 14, the Frank and Walter, the Thomas Kelly, Sr., the Reo, and the Mary Dougherty.

Otto & Lyon, of New York City (John A. Lyon, of New York City, of counsel), for the J. A. Hill and master.

Single & Single, of New York City, for the Paul R.

MOSCOWITZ, District Judge. This is a proceeding brought by the Pennsylvania Railroad Company, owner of the tug Brinton, to limit liability for claims brought against it by a number of coal boats and by owners of property in Long Beach for damages suffered in 1925. The suit arises against the railroad company for damages sustained by boats which were broken adrift from the Pennsylvania mooring stakes at South Amboy, N. J. The railroad company was also impleaded in certain salvage suits begun against certain of the boats.

The Pennsylvania Railroad Company began this proceeding by filing a petition. The boat owners and the city of Long Beach and Long-Beach-on-the-Ocean, Inc., filed claims in this proceeding. The damage of the two latter claimants was due to pounding against the Long Beach boardwalk by some of the boats that had been cast adrift. The railroad has filed an ad interim stipulation, showing the value of the Brinton to have been $10,000 at the time of the accident.

It has been stipulated at the trial that the following boats were either damaged or lost: Red Hawk, Irene, Shirley, Carrie, J. A. Hill and master's personal effects, Blue Coat and the effects of her master, and salvage paid to one Wilson, Blue Haven and the effects of her master, Peter Begor, Blue Gown, Paul R., Red Star No. 38, L. T. No. 14, Frank and Walter, Thomas Kelly, Sr., Reo, Mary Dougherty, Lake Michigan, Mink, and Edna.

The aggregate number of vessels lying at the mooring stakes was approximately 55 boats. The boats were tiered along the stakes, and others were out from the stakes, some of the tiers being 8 or 10 wide, and others at the head being only 3 wide. The place where the boats were moored, according to Claimants Exhibit B, shows that the stakes were very much exposed to a northwest or westerly wind, and when a west or northwest wind swept down the boats made fast at the light stakes received the full benefit of it.

On Saturday, October 24, 1925, a southeast storm warning was hoisted, and the United States Weather Bureau had given warning of a southeast storm, which was expected to cause strong southeast and southerly winds, probably reaching a gale force, and shifting to west and northwest Sunday morning. At 10:30 a. m. on Sunday, October 25th, a warning was given as follows: "Storm of marked intensity. Advise all shipping along North Atlantic coast. East and southeast gales shifting to westerly this afternoon or to-night." These warnings were given out by the United States Weather Bureau.

Between 9 and 10 a. m. on October 25th the wind reached a maximum velocity of 34 miles per hour. From 10 to 11 a. m. the maximum velocity was 38 miles south; from 11 to 12 noon, a maximum of 57 miles south; from 12 noon to 1, a maximum of 74 miles per hour from the southwest; from

1 to 2 p. m., a maximum of 83 miles per hour from the west; between 2 and 3 p. m. the wind blew 60 miles from the west, and between 3 and 4 p. m. a maximum of 72 miles from the northwest.

The Pennsylvania Railroad maintains at South Amboy a loading plant, which discharges coal into barges. The custom is for barges to be tied at the mooring stakes, and for the Pennsylvania Railroad to send out tugs to bring them in, load the barges, and then place them back at the mooring stakes.

The yard at South Amboy was in charge of a Mr. Crane, who was the shipping and terminal agent, and who had "supervision of the terminal and shipping of coal." The shippers of coal dealt directly with him, and vessels arriving reported to him and were required to do so. He had full control of all activities at the terminal and of all the railroad employees there, whether they were engaged in land or maritime occupations.

The evidence shows that the distribution of warnings by the United States Weather Bureau included direct notice to the railroad's Jersey City office, with which Crane was in direct telephone communication, and that he received notice of the expected storms and posted them at the bulletin board at South Amboy.

At about 2:10 p. m. on October 25th, Mullen, the master of the Brinton, received orders from Crane's office to bring in the Blue Coat to the loading berth. The Blue Coat was in about the middle of the 55 light boats made fast to the mooring stakes, and the Brinton, throwing off the lines of the surrounding vessels at about 3 or 3:15 p. m., passed a line to the Blue Coat and, endeavoring to haul it out, set some other 20 barges adrift. The believable testimony shows that, when Mullen was given the orders to bring in the Blue Coat, he had no discretion to bring in any boat except that one.

Crane testified as follows:

"Q. What do you mean when you give him such a list? A. I do not know. I think I have made it clear enough.

"Q. When you give the captain of the tugboat the list of names of the boats, what do you mean for him to do? A. The captain is furnished a list of boats we want.

"Q. And when you give him that list you intend for him to understand he is to go and get these boats? A. He is supposed to place those boats under the dumper.

"Q. Do not equivocate. That is what you mean, to go and get those boats and put them under the dumper? A. I am not trying to equivocate. I think you are trying to tangle me up. All you have to do is to ask straight questions.

"Q. When you give the tug captain a list of boats, you mean for him to understand he is' to go and get those boats and bring them in under the dumper? A. Naturally.

"Q. Can't you say yes or no? You mean for him to get the boats and bring them in? A. We want them in; yes.

"By the Court: Q. Your answer is yes, isn't it? A. There is no question about that."

And Mullen testified as follows:

"Q. When you received your orders, did you go right out for this boat? A. Yes, sir.

"Q. And he called out to you to go out and get the boat? A. Yes, sir.

"Q. And you immediately went right out to the tow? A. Yes.

"Q. That is your usual and customary way of doing things? A. Yes, sir.

"Q. As soon as you get your orders, you go out and carry them out? A. Yes, sir.

"Q. That has been the custom there for the years you have been there? A. Yes, sir."

And further on in the testimony he testified:

"Q. When you got the order, you went right out? A. Yes.

"Q. And you knew it was your duty to go right out? A. Yes."

And in response to the following questions, the following answers were given by Mullen:

"By the Court: Q. You had no discretion about bringing any boat in except that one? A. No.

"Q. You had to bring that one? A. Yes."

And at another time Mullen testified:

"Q. Did you make a report to the local inspector's office about this casualty? A. Yes, sir.

"Q. You made that in writing? A. Yes, sir.

"Q. Did you tell them you were sent out there to get that boat? A. Yes, sir.

"Q. I asked you if it was your contention, in exonerating yourself before the inspectors, that you were sent there and had to do your duty? A. Yes."

The question in the case resolves itself, first, to whether or not the captain of the Brinton was negligent; and, secondly, assuming he was, is there any evidence to

show that there was any privity or knowledge on behalf of the Pennsylvania Railroad.

Mullen admits that he was "taking a chance" when he went out to bring the Blue Coat in, and he knew it was his duty to go right out. Mullen testified as follows:

"Q. You did say it was this wind, when you said you were taking a chance, didn't you? A. Yes, sir.

"Q. Is that true? A. Yes, sir; the wind was blowing.

"Q. And that is what you meant by a chance? A. Yes, sir."

Mullen also admitted that, with the wind blowing as it was, it would inevitably cause the boats to fan out when disturbed and endanger them. Mullen further admitted that the Brinton was not able alone to drill out the Blue Coat in the wind that was then blowing. He testified as follows:

"Q. If you had this other tug to help your tug, while drilling out the other boat, it would have been safe, wouldn't it? A. If there was another tugboat there; yes, sir."

The testimony of Mullen as to whether another tugboat would be helpful was corroborated by both Captains Fay and Pierce. Mullen also testified that he could not arrest the drifting of the barges; that his boat did not have the power, and that he was taking a chance, and could not get away with it. There is no doubt that the maneuvering of Mullen in endeavoring to drill out the Blue Coat in the storm that was then raging was a negligent act on his part, for, as Mullen testified, he paid no attention to the storm warning on the bulletin board, for at the time he actually began his maneuvering a storm was there. Mullen further testified that between 3 and 4 p. m. he took no consideration of the wind at all.

The question now remains whether or not this negligent maneuvering was done with the privity and knowledge of the railroad. United States Revised Statutes, § 4283 (46 USCA § 183), concerning limitation of liability, reads as follows:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The testimony shows that Crane had sufficient authority to bind the railroad. "While the cases generally speak of the knowledge of managing officers as being the knowledge of the corporation, the real test is not as to their being officers in a strict sense, but as to the largeness of their authority." In re P. Sandford Ross, 204 F. 248, 251 (2 C. C. A.). See, also, The Linseed King (D. C.) 24 F.(2d) 967.

The burden is upon the petitioner to show that the negligent act was not done with the privity and knowledge of the Pennsylvania Railroad Company, the petitioner. The Lindseed King, supra. This burden has not been sustained by the railroad.

The evidence is clear that Crane was the terminal and shipping agent, and that he had complete charge and supervision of the docks and piers at South Amboy, and that there was no one superior to him there, and that he was delegated with authority and power to do whatever he deemed necessary with respect to the operation of cars and of the boats to be loaded at the terminal at South Amboy. He had occupied that position for 18 years. His office received orders direct from the shippers of coal, and issued all orders, both to the yards for the cars wanted and to the tug master for boats to be loaded.

Crane knew, at the time that he gave orders to bring in the Blue Coat, that a storm was raging. He knew the number of vessels lying at the stake, and the relative position of each boat there, and a man with his experience should have known that it would be an act of negligence to send the tug Brinton out alone to bring in the Blue Coat. The Circuit Court of Appeals of the Fifth Circuit, in Texas & Gulf S. S. Co. v. Parker, 263 F. 864, has held that where an owner's manager gave orders to a master to sail, and where that master had the responsibility to decide if the evidence showed that the owner's manager knew of the decision of the master to sail prior to his departure, and if that master's act was a negligent one, the owner's manager's knowledge was that of his principal, and considered privity on the part of the owner with the negligence of the master, and prevented the limiting of liability. It was negligence on the part of Mullen to take the tug Brinton out in this storm, and it was negligence on the part of Crane to permit the tug to do so.

After the boats had broken adrift, some drifted down to Long Beach, where damages were subsequently done to the boardwalk. The question is raised that the barges

should have dropped anchors, and that, if they did, no damage would have resulted to the barges or the Long Beach boardwalk.

What was the proximate cause of damage to the boardwalk? Was it an act of negligence on the part of the petitioner, or was it a subsequent tortious act on the part of the barges, because they did not drop anchors? The law is now settled that prima facie the intervention of a subsequent tort-feasor in the train of consequences started by an earlier absolves the first. "This is probably ordinarily true, but not if the second wrong and its consequences are fairly foreseeable from the start." George H. Jones, 27 F.(2d) 665, 668 (C. C. A. 2). The mere fact that vessels have or have not anchors, or fail to drop anchors, is immaterial, if dropping an anchor would be of no use, and in such circumstances the absence of an anchor is not a fault. The Fort George, 183 F. 731 (C. C. A. 2).

The evidence is convincing that the dropping of an anchor would have been of no use. Mullen testified that he did not use his own anchor, because he feared that it would be of no use under the circumstances. The Blue Gown, one of the boats in the fleet, let go its anchor and drifted for about an hour before it fetched up. Then it fetched up, not because the anchor held, but rather because of the fact that the anchor fouled a cable. As a matter of fact Captain Mullen testified that he did not give orders that anchors be dropped while the boats were on the flats, for he was waiting for a tug to come to his assistance. He testified that he had cut the barges loose, and when he went out for them again he did not then tell them to drop anchors.

The 22 boats were set adrift on Sunday, October 25th. When they were set adrift, the Brinton tried in vain to tow them back, but they drifted to sea. At 5 a. m. on Monday, off Long Beach, the Brinton cut away from the barges and returned to South Amboy, arriving there at 10 a. m., when a report was made by the master.

The railroad knew that the boats had broken adrift through Mr. Crane's report, and had received notice of the impending damages to the Long Beach boardwalk from claimants and from the Coast Guard. Mr. Kuehnle, a civil engineer, testified for the claimants that barges were adrift off Long Beach. On Monday, October 26th, he telephoned the Pennsylvania Railroad at Jersey City, and asked for the marine superintend-

ent, and was informed he was not in. He then asked for the assistant marine superintendent, and told the man on the other end of the wire that boats were adrift, and that they were in dangerous proximity to the boardwalk, and was told that the Pennsylvania Railroad had no definite plans in regard to these boats.

Mr. Doll, accident clerk of Pennsylvania Railroad, testified that he had received calls from Captain Wilson of the Coast Guard on Monday, informing him that 19 boats were adrift off Long Beach. The information from Wilson was passed to the accident department in the superintendent's office.

Kuehnle testified it was between 1 and 3 p. m. on Monday when he made the call. At that particular time it seems that the physical damage to the property then existent was at one particular point, and was occasioned by two of the drifting barges, and was rather slight. The boats continued off shore in about the same position on Tuesday. On Tuesday and Wednesday storm warnings were broadcast. On Wednesday there was a strong southerly wind; at noon it was a 34 mile blow, at 9:20 p. m. it was 66 miles, and high winds blew through the remainder of Wednesday night and early Thursday. Kuehnle testified he went to the beach on Thursday morning and discovered additional and extensive damage to the boardwalk.

Captain Newman, the marine accident investigator for the Pennsylvania Railroad, testified that on Monday, October 26th, he went out on board in command of the ship Resolute, which was chartered from Merritt & Chapman. The Resolute was the only one of Merritt & Chapman's large salvage fleet which the railroad chartered, or even attempted to charter. Newman admitted that he was out on the Resolute, looking for the Brinton and the light tow. When, however, he had located the Brinton, the Resolute did not go out again. On Tuesday Newman testified, after he had received a telephone call that the barges were adrift off Long Beach and menacing property, he received authority from the marine superintendent to charter the Resolute again. She was not available. That finished his and the Pennsylvania's efforts to give any further aid or help to the drifting vessels.

Captain Newman testified that when he was on the Resolute Monday he could not get the coal barges, which were adrift off Long Beach, because they were in the breakers on the beach. If this were so, no reasonable explanation can be given why Newman

endeavored to charter the Resolute again on Tuesday.

Kuehnle testified that on Monday the boats were not on the beach, but rather they were drifting. Several of these drifting boats had been towed away Tuesday by a fishing vessel. The railroad tug Brinton, which sent the barges adrift on Sunday at 3 p. m., abandoned salvage efforts on Monday at 5 a. m., returned to South Amboy at 10 a. m., and quit.

The tug John T. Hughes, an independent salvor, volunteered for service. On Sunday she picked up four barges, namely, Red Star No. 38, Burns Bros. No. 92, Susan Clark, and H. M. Stagg, and within a mile of South Amboy, at about 11 p. m., she turned them over to the Pennsylvania Railroad tug No. 32. She arrived at South Amboy at noon Monday with barge Blue Gown, and tied up at the Pennsylvania Railroad Terminal. Her services ended there, and she was not requested by the railroad to go out again, although she was in South Amboy on the 26th, 27th, and 28th.

The Pennsylvania tug No. 32 arrived at South Amboy on Sunday at about 8 p. m. with a light tow. She proceeded to help the Brinton, although no orders were given to her by the railroad. The Pennsylvania tug No. 32, with the wind moderate and there being no danger, took boats from the tug Hughes, which the latter had picked up, and No. 32 towed them into South Amboy, arriving at 10:40 p. m. Sunday. This was all the work No. 32 accomplished.

The Pennsylvania tug Overbrook had come down the Kills Sunday night with a light tow, which she had put in charge of another tug, and when it became dark she started out to help the Brinton. At 9:30 p. m. the Overbrook went aground and "stayed there until about 1 o'clock, or a little later, and then went back to South Amboy." The master then went to bed, the tug tied up, and nothing further was done.

■ The railroad was negligent because of its feeble efforts to send help on Monday, and its failure to send any assistance on Tuesday or Wednesday. Maryland Transportation Co. v. Dempsey, 279 F. 94 (C. C. A. 4).

The tug John T. Hughes has filed a claim for salvage services against the barges Red Star No. 38, H. M. Stagg, Burns Bros. No. 92, Susan Clark, and Blue Gown. The Pennsylvania Railroad has been impleaded under the fifty-sixth rule in admiralty by proctors for the claimant barges, who allege that the salvage services, if any, were performed at the instance and request of the Pennsylvania Railroad and for its benefit. The evidence shows that the salvage services performed by the John T. Hughes were rendered for the Pennsylvania Railroad Company. The salvage services were of a low order of merit.

■ The tug John T. Hughes may recover for salvage services from the Pennsylvania Railroad Company. The John T. Hughes will be awarded the sum of $100 for services rendered to the barge Burns Bros. No. 92, $100 for services rendered to the barge Susan Clark, $100 for services rendered to the barge H. M. Stagg, $100 for services rendered to the barge Red Star No. 38, and $50 for services rendered to the barge Blue Gown. The award will be apportioned one-quarter to the crew and three-quarters to the owner.

■ The libel of the Pennsylvania Railroad Company, owner of the tug P. R. R. No. 32, against the barges Burns Bros. No. 92, Red Star No. 38, Blue Gown, H. M. Stagg, and Susan Clark for salvage is dismissed.

The libel of the Pennsylvania Railroad Company, as charterer of the tug Resolute, against the boats Shirley and Irene, for salvage, is dismissed.

The claim of McWilliams Bros. for right to recover over from the Pennsylvania Railroad Company for salvages paid to one Eldred for services rendered to the barge Shirley is allowed.

The petition for limitation of liability is denied. A decree, with the usual order of reference, may be entered in accordance with this opinion for the following: Blue Gown, Red Hawk, Irene, Shirley, Carrie, J. A. Hill and master's personal effects, Blue Coat and the effects of her master, Joaquin Rene, and salvage paid to one Wilson, Blue Haven and the effects of her master, Peter Begor, Paul R., Red Star No. 38, L. T. No. 14, Frank and Walter, Thomas Kelly, Sr., Reo, Mary Dougherty, Lake Michigan, Mink, and Edna, and the claim of the city of Long Beach and Long Beach-on-the-Ocean, Inc.

Settle decree on notice.