### GREENE et al. v. UNITED STATES et al.

United States District Court
S. D. New York.
June 17, 1952.

See also, D.C., 104 F.Supp. 667.

Silas B. Axtell, Richard Gyory, New York City, for libelants.

Myles J. Lane, U. S. Atty., Martin J. Norris, Willian H. Postner, Attys. Dept. of Justice, New York City, for United States.

WRIGHT, District Judge.

This is a claim for salvage arising out of the torpedoing of the S.S. Thomas G. Masaryk while in convoy in the Mediterranean with a cargo of war matériel consigned to Russia. The vessel was subsequently beached and a portion of the cargo salvaged with the help of the libelants, who were members of the crew of the S.S. William M. Meredith, which vessel was in the same convoy with the Masaryk. The court, after due consideration of the pleadings, the evidence and the arguments of counsel, now makes the following findings of fact and conclusions of law.

### Findings of Fact.

1. On April 20, 1944 the S.S. Thomas G. Masaryk, a Liberty ship owned and operated by the United States of America, and carrying a cargo of Lend-Lease goods destined for the Union of Soviet Socialist Republics, was proceeding in the Mediterranean Sea about 100 miles east of Gibraltar when she was struck by a torpedo in the No. 3 hold. She commenced to burn and dropped out of the convoy. Thereupon her master and crew abandoned ship, were picked up by a British escort vessel and brought into Alexandria, Egypt. At the time her cargo consisted of airplanes, armored scout cars, ammunition, machine guns, jeeps, trucks, half-tracks, chemicals, food stuffs and steel rails.

2. After the Masaryk dropped out of the convoy she was shelled at the water line by a British destroyer to allow sea water into her holds to extinguish the fire. Thereafter she was towed by the British Tug Wahlmouth and beached in 28 feet of water at the Bay of Bomba near Tobruk, North Africa. The Wahlmouth, a vessel 100 feet in length, carried a complement of ten men.

3. The master of the Masaryk, Captain Robert Sloan, remained in command of his crew while they were temporarily at Alexandria. On April 27, 1944 eleven officers and crewmen in charge of Chief Mate Anthony J. Esposito rejoined the Masaryk where she lay in the Bay of Bomba. On May 2, 1944 Captain Sloan and seven officers and crewmen rejoined the Masaryk in the Bay of Bomba, bringing to a total of nineteen of the ship's company who had rejoined the vessel for the purpose of assisting in transferring cargo and lightening the Masaryk.

4. H.M.S. Captive is a deep sea tug approximately 130 feet in length valued at $150,000 and especially equipped for salvage work. She carried a complement of approximately forty officers and men. From April 27, 1944 to June 7, 1944 the Captive remained alongside the Masaryk supplying her with steam, the use of her salvage equipment and the services of a diver. By using steam from the Captive, water in the holds of the Masaryk was constantly pumped out so as to enable cargo discharging operations to proceed; through the service of the Captive's diver and the use of her salvage equipment the opening

in the side of the Masaryk caused by the torpedo and the shell holes were closed up and plugged. On June 7, 1944 the Masaryk was towed by the H.M.S. Captive from the Bay of Bomba to Port Said, Egypt, arriving there on June 10, 1944.

5. H.M.S. Favourite, a deep sea tug valued at $150,000 and carrying a crew of some forty officers and men, stood by the Masaryk for approximately a week during the unloading operation.

6. Throughout the period from May 2, 1944 to June 7, 1944 the nineteen crew members of the Masaryk worked in the holds of the vessel breaking out cargo to her deck from which it was loaded into the holds of the S.S. William M. Meredith, as will hereinafter appear.

7. On May 4, 1944, fifty British colonial troops under the command of a British captain and sergeant came aboard the Masaryk and from that date until June 7, 1944 these colonial troops were engaged in stevedoring work unloading cargo from the holds of the Masaryk and loading it into the holds of the Meredith.

8. The S.S. William M. Meredith, a Liberty ship owned and operated by the United States of America and valued at $1,500,000, was in the same convoy as the Masaryk. She completed her voyage with the convoy to Alexandria, Egpyt, where she discharged her cargo. The libelants herein, Captain Leonard J. Greene and the crew of the Meredith, volunteered to return with the Meredith to the Bay of Bomba and assist in transferring the cargo aboard the Masaryk into the Meredith's holds. On April 30, 1944 the Meredith proceeded to the Bay of Bomba arriving alongside the Masaryk on May 2, 1944. The Meredith, in command of Captain Greene, carried a complement of forty-four officers and men.

9. The Meredith used her booms and rigging for the purpose of transferring cargo from the deck of the Masaryk into the holds of the Meredith. Various of the forty-four members of the crew worked aboard the Meredith assisting in stowing cargo. From time to time members of the Meredith's crew worked on the deck of the Masaryk engaged principally in hosing down cargo taken from the Masaryk's hold.

10. Aboard the Meredith throughout this operation and guarding the personnel and vessel engaged was a United States Navy armed guard crew of approximately twelve officers and men.

11. Cargo aboard the Masaryk at the time she was loaded in an American port in April, 1944 totaled 6,700 tons, the sound condition value of which was in excess of $5,000,000. Of this cargo 3,040 tons were transferred to the Meredith. The interest of the United States in the salved cargo is found to be $1,000,000.

12. The record does not clearly demonstrate who had legal title to the cargo of the Masaryk at the time in question. It was purchased by the United States for Russia and was being delivered in a United States vessel to Korhhamshar in the Persian Gulf for trans-shipment as directed by Russia. It further appears that in accordance with Article 5 of the Master Lend-Lease Agreement between the United States and the Union of Soviet Socialist Republics, the United States had a right to the return of such cargo as was not destroyed, lost or consumed during the war and which the President of the United States would determine was useful to the defense of the United States of America.

13. As a result of the torpedoing and shell fire the S.S. Thomas G. Masaryk became a total constructive loss and had no residual value.

14. The transfer of the salved cargo from the Masaryk to the Meredith was unhampered by the weather, except for three days during which because of high winds the two vessels had to be separated. The temperatures were normal for the area at the time. However, the salvage work was rendered more difficult by the fact that maggots had gotten into many of the foodstuffs, particularly the pork, making the containers of these foodstuffs and the cargo adjacent thereto slippery and difficult to manage. The work was further complicated by the disagreeable odor of large quantities of dried egg rotting in the holds.

15. The salvage work performed by the libelants herein was slightly more dangerous than the work they would ordinarily be required to perform under their shipping articles. It is true that under the shipping articles libelants could be required to enter war zones and they were paid war bonuses depending on the danger involved. However, under the articles they would not ordinarily be required to take their vessel alongside a sister ship in distress and assist in taking aboard from the distressed vessel her cargo. This operation exposed libelants to danger beyond and above the requirements of the articles. It must be remembered that this salvage operation extended over a period of several weeks and took place in an isolated and unprotected spot off the northern coast of Africa one hundred miles from the enemy-held island of Maita.

16. Throughout the period from May 2, 1944 to June 7, 1944 Captain Greene and the crew of the Meredith received their regular base wages. Throughout that period the master and crew of the Meredith, in addition to their regular wages based on eight hours work per day, received overtime compensation for the stevedoring work performed in stowing the Masaryk's cargo in the Meredith's holds. They were engaged in this stevedoring service for approximately fourteen hours each day and were paid overtime for each of such hours, averaging about 300 hours of overtime per man for the period in question.

17. Throughout the period from May 2, 1944 until June 23, 1944 when the cargo carried by the Meredith was unloaded at Port Said, Egypt, the captain and crew of the Meredith received a war bonus of 100% of base wages, a war bonus of 66⅔% of base wages, and an area bonus of $6 per day. All work performed by libelants during this period was in connection with the salvage operation and for this work the libelants have already been paid approximately $30,000.

## Conclusions of Law.

1. Three elements of salvage must be present before salvors are entitled to an award: (1) the ship or her cargo must be in marine peril; (2) the salvors must be volunteers; and (3) the salvage operation must be successful. The Sabine, 101 U.S. 384, 25 L.Ed. 982. These three elements of salvage are present in this case.

2. The common ownership of the vessels involved is no bar to salvors of one vessel receiving an award for work performed with respect to the other. 46 U.S. C.A. § 727; Jacobsen v. Panama R. Co., 2 Cir., 266 F. 344; The Olockson, 5 Cir., 281 F. 690; Kovell v. Portland Tug & Barge Co., 9 Cir., 171 F.2d 749.

3. All who engage in a joint salvage venture are entitled to be considered for a salvage award whether or not they are before the court. The Blackwall, 77 U.S. 1, 12, 19 L.Ed. 870. The extent of participation of the libelants in the over-all salvage operation must determine their participation in the salvage award.

4. While the record does not clearly demonstrate legal title to the salved cargo in the United States, the interest of the United States in this cargo was substantial. It cannot be doubted that the United States benefited from this salvage, and the amount of benefit conferred is of course a primary consideration in determining a salvage award. The Nord Alexis, 2 Cir., 273 F. 160, certiorari denied 257 U.S. 635, 42 S.Ct. 48, 66 L.Ed. 409; The Wahkeena, 9 Cir., 56 F.2d 836.

5. The services of libelants in assisting in the transfer of the cargo from the holds of the Masaryk to the holds of the Meredith was salvage of a low order but that fact does not restrict libelants to nominal awards. Texas Co. v. Texas & Gulf S. S. Co., 5 Cir., 263 F. 868, 871; Burke v. United States, D.C., 96 F.Supp. 335.

6. The court concludes that the total salvage award herein should be 10% of the value of the interest of respondent in the cargo salved, or $100,000. The participation of the Meredith in the over-all salvage operation is fixed at 30% or $30,000, of which two-thirds would ordinarily be payable to the ship and her owner, leaving an award to libelants herein of $10,000.

7. Since libelants have already received $30,000 from the respondent for the work performed in the salvage operation, no additional award is due them.

Decree for respondent.