### HENDRY CORP. et al. v. AIRCRAFT RESCUE VESSELS, C–77436 and C–77439.
### No. 1432.

United States District Court
E. D. Louisiana, New Orleans Division.
June 15, 1953.

Supplemental Opinion June 27, 1953.

Deutsch, Kerrigan & Stiles, Rene H. Himel, Jr., New Orleans, La., for libelants.

Terriberry, Young, Rault & Carroll, Benjamin W. Yancey, New Orleans, La., for respondents.

WRIGHT, District Judge.

Two 104 feet aircraft rescue vessels in tow in Port Royal Sound broke away from their tug during a storm and fetched up on the beach north of Hilton Head Island. After considerable effort and much delay, they were re-floated. Libelants herein seek a salvage award based on services rendered in re-floating the vessels.

The California Company, owner of the aircraft rescue vessels, entered into an

agreement of towage with the Hendry Corporation, one of the libelants herein. Under the contract Hendry Corporation agreed to tow seven aircraft rescue vessels without cargo from Charleston, South Carolina, to Harvey, Louisiana. Hendry Corporation was to furnish two tugs, the General Pershing and the Dragon, one tug to tow four of the vessels and the other three. The contract also contained the following provisions:

"The method of making up the tows will be determined by Hendry subject to the approval of representatives of California at Charleston, South Carolina. California assumes full responsibility for the method in which the tow is to be made up at the commencement of the voyage.

"The towage contemplated will be done at the sole risk of the aircraft rescue boats and neither Hendry nor the towing tugs or any other equipment used in the towage shall be liable for any loss or damage to the aircraft rescue boats unless the damage is caused by the gross negligence of Hendry, its agents or employees * * *."

The Hendry Corporation designated the Tug Dragon to tow the four aircraft rescue vessels from Charleston. Since this case concerns two of these four aircraft rescue vessels, no further reference will be made to the General Pershing and her tow except insofar as the General Pershing participated in the salvage of the stranded vessels.

The Dragon is a tug 54½ feet long, 17½ feet in beam, 5.8 feet in draft with a Diesel engine of 230 horsepower. The General Pershing is a Diesel tug 60 feet long, 16 feet 3 inches in beam, with a draft of 5 feet 5 inches. Her indicated horsepower is 225. The aircraft rescue vessels are of double plank mahogany 104 feet long, 19 feet in beam with a draft of 5 feet 6 inches. Each is powered with two marine engines developing together in excess of 3000 horsepower. The Hendry barge, hereinafter referred to, is made of wood sheathed in steel. She is approximately 105 feet long, 32 feet in beam and 9 feet in depth. At all pertinent times she was partially loaded with what has been described as "junk".

The makeup of the tow of the Dragon was directed by two representatives of the California Company and one Anslow, Charleston superintendent of the Hendry Corporation. In addition to the four rescue vessels, there was included in the tow the Hendry barge. The rescue vessels were made up two abreast with the barge astern.

There is a dispute in the evidence as to whether or not the representatives of California Company knew and approved of the barge being included in the tow. While it is customary in the towage business to include vessels of several different owners in the same tow, the towage agreement here seems to indicate that no other vessels would be towed. The matter is further confounded by the fact that Mr. Anslow of Hendry Corporation, who directed the makeup of the tow along with the representatives of the California Company, was drowned during the salvage operations. The master of the Dragon, however, testified that the representatives of the California Company knew and approved of the barge being included in the tow, while the same representatives steadfastly deny knowledge or approval. Since, as will be seen, it was the overload on the tug rather than the makeup of the tow which caused the vessels to strand, it will be unnecessary to resolve this conflict.

The Dragon and her tow departed Charleston early the morning of February 29, 1948. At the time the weather was fair and no storm warnings of any kind were displayed. On March 1, 1948 the tow entered Port Royal Sound from Beaufort River and headed south across the Sound toward the Intracoastal Waterway, a distance of three and a half miles. As the tow entered the Sound, a severe windstorm broke with northeast winds of 40 miles per hour. The Dragon headed into the wind in an attempt to ride out the storm, but after an hour the combined action of the wind and the tide in the sound, which was variously estimated from three to seven miles per hour, broke the cables coupling the two pairs of rescue vessels, and one pair of rescue vessels together with the

barge stranded on the lee shore of Hilton Head Island southwest of Port Royal Sound.

The storm in Port Royal Sound continued for several days and all efforts on the part of the Dragon to recover the stranded vessels proved unavailing. Hendry Corporation dispatched its tug General Pershing to the scene and Anslow arrived on March 3rd to direct the salvage operation. The attempt to salvage the vessels continued under Anslow's direction until March 5th when Anslow was drowned while attempting to recover a line which the Dragon had secured to the stranded vessels and bouyed the day before. On March 7th Hendry's Tampa superintendent, Kennard, arrived to direct the salvage operations. Finally, on March 10th, after the weather had moderated considerably, one of the rescue vessels was refloated and the other was brought off the beach the following morning. The vessels were pumped out, cleared of wreckage and debris and towed by the General Pershing to New Orleans where they were delivered to California's representative.

The Hendry Corporation, Kennard and the master, officers and crew of the General Pershing filed this libel in their own behalf and in behalf of Anslow's Estate to recover a salvage award for saving the aircraft rescue vessels. The California Company, claimant of the vessels, filed a cross-libel against Hendry for damage to the vessels resulting from the breakup of the tow.

Claimant does not contend that the provision of the towage agreement relieving the Hendy Corporation from liability for all except gross negligence, is unenforcible or against public policy. It contends, first, that the evidence proves gross negligence on the part of Hendry and alternatively, if it does not, it proves negligence, and consequently the libelants cannot recover a salvage award.

California contends that the Dragon and her owners were guilty of gross negligence in that the Dragon was undermanned and overloaded by the addition of the barge to the tow. Claimant also contends that the Dragon was unseaworthy in that she was not equipped with a radio by means of which warnings of the storm in Port Royal Sound could have been received.

■ Gross negligence has been defined as the entire absence of care, or very great negligence. It consists of utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others. Hollander v. Davis, 5 Cir., 120 F.2d 131. Viewed from that standard, the actions of the Hendry Corporation leading up to the stranding of the rescue vessels do not amount to gross negligence. Although not convincing, there is yet substantial evidence in the record tending to show that the Dragon was capable of handling her tow, including the barge, in any weather reasonably to be expected during the voyage. Such evidence alone negates the charge of gross negligence based on overload. The charge that the Dragon was undermanned is without merit. She had a full complement as provided by her certificate. It is true she had no radio, but the evidence shows that no storm warnings were received by tugs in the area having radios. Further, the mere absence of a radio on a tug does not make her unseaworthy. The Dragon was built many years before radio came into vogue and the failure of her owners to have one installed does not necessarily make her an anachronism. The Pacific Fir, 2 Cir., 57 F.2d 965, 1932 A.M. C. 738. In any event, there is no proof that her failure to have a radio in any way contributed to the stranding of the vessels.

■ Claimant, however, is on much stronger ground when it reduces its charge against the Hendry Corporation to simple negligence. It is true that a tow boat is liable neither as an insurer nor as bailee of her tow. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. Her duty is to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar services. Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309, 1952 A.M.C. 876. Nor is a tug required to withstand all the perils of the sea or to control her tow in extreme weather. Waterman S. S. Corp. v. Shipowners & M. Towboat Co., 9 Cir., 199 F.2d 600, 1952 A.M.C. 1988.

Nevertheless, when a tug undertakes to tow more than she can reasonably be expected to tow through weather reasonably to be expected on the voyage, there is fault. The Dragon may have been properly manned and she may not be required to have a radio receiver on board, but the record does not justify the inclusion of the barge in the tow. The evidence shows that the inclusion of the barge reduced the tow's speed by half. In fact, when bad weather was encountered in Port Royal Sound, the tow made no headway at all. Although the calm safe water of the Intracoastal Canal was less than three miles away, the Dragon had no alternative but to expose her tow to continued pounding from the wind and sea. Even the master of the Dragon reluctantly admitted that she was overloaded and that he had so complained to Hendry officials. It was this overload which directly contributed to the breakup of the tow and the subsequent stranding of the vessels.

The inclusion of the barge also made the tow unseaworthy. It did more than overload the tug. The weight of the barge pulled the cleats and the bitts, to which the lines were made fast on the rescue vessels, out of the decks of those vessels. The aircraft rescue vessels are wooden vessels of light design whose mission is to effect rescues on water through the use of high speed. No prudent seaman would have attempted to tow the snub-nosed barge astern of the rescue vessels. It should have been obvious to Anslow and the Hendry Corporation that the very weight of the barge would pull the bitts and cleats through the decks of the rescue vessels in the event any sizeable seas were encountered.

■■■■ Having found fault on the part of Hendry Corporation, it is pertinent now to determine the effect of that fault on the individual claims for salvage. First of all,

it is clear that a tower may be granted a salvage award for rescuing the tow where the tow has become imperiled through no fault of the tower. The Connemara, 108 U.S. 352, 2 S.Ct. 754, 27 L.Ed. 751; The Olockson, 5 Cir., 281 F. 690. Since the fault of Hendry Corporation contributed to the stranding of the rescue vessels, however, that corporation is not entitled to salvage award. The Clarita and The Clara, 23 Wall. 1, 23 L.Ed. 146. And this is true even though the Tug Pershing, also owned by Hendry, participated in the salvage. The Glenfruin, 10 P.D. 103; The Pine Forest, 1 Cir., 129 F. 700, 1 L.R.A.,N.S., 873. The claim in behalf of Anslow likewise must be denied for the record shows that Anslow supervised the entire towage operation until the tow departed Charleston. The fault of the Hendry Corporation was Anslow's fault. Kennard, the officers and men of the Pershing, however, are entitled to a salvage award. The fault of Hendry Corporation cannot bar their recovery for services performed, there being no evidence whatever showing they contributed to the stranding of the vessels. The Glenfruin, supra.

■■■■ In view of all the circumstances surrounding this entire salvage operation [1], the total salvage award should be 10% of the value of the vessels on being salved. In considering the portion to be awarded one set of salvors, the contribution made by all concerned with the salvage effort whether or not participating in the award must be considered. The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870; Greene v. United States, D.C., 106 F.Supp. 682. Non-prosecution of their claims by some salvors and inability to make claim in others inures to the benefit of the owners of the salved vessels and not to salvors who do prosecute their claims. The Blackwall,

1. In The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870, the Supreme Court named the following considerations as determinants of the amount of a salvage award: (1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

supra. Participating in the salvage operation at bar were the Tugs Dragon and Pershing, the officers and crews of both vessels, Anslow and Kennard. Ordinarily two-thirds of the salvage award goes to the vessel and one-third to the officers and men. Greene v. United States, supra. Using that rule of thumb and assuming all salvors may participate in the award, the award would be divided on the following basis: Two-thirds to Hendry Corporation as owner of the Tugs Dragon and Pershing, one third to Kennard, Anslow and the officers and crews of the tugs. Consequently, Kennard, the officers and men of the Pershing will be awarded one-sixth of one-tenth of the value of the vessels on being salved.

### Supplemental Opinion

 Since the opinion of the court herein finding fault against Hendry Corporation in the stranding of the aircraft rescue vessels, claimant has re-urged a contention previously made but unsupported by authority or argument. Claimant's contention is its asserted right to recover over against Hendry any sums it might be called upon to pay as salvage. Claimant argues that the release clause in the agreement protects Hendry against claims "for any loss or damage to the aircraft rescue boats" but salvage is not "loss or damage to the aircraft rescue boats", and consequently Hendry, being at fault in the stranding, is liable for salvage. The Brinton, D.C., 35 F.2d 543; Olsen Water, etc. Co. v. United States, 2 Cir., 21 F.2d 304; The Loyal, 2 Cir., 204 F. 930; The Refrigerant, Aspinall's Maritime Cases, Vol. XVI N.S., p. 559.

This argument perhaps would be sound but for the first part of the release agreement which reads: "The towage contemplated shall be done at the sole risk of the aircraft rescue vessels." Obviously such provision would cover the risk of salvage. Any other interpretation of this release agreement would be unrealistic. To sustain claimant's contention in this regard it would be necessary to hold that if Hendry's efforts to refloat the vessels had been unsuccessful, Hendry would be released from liability for loss of the vessels, but because Hendry was successful in getting the vessels off the strand, it is not released from liability for the salvage award. In view of the above, California's claim over against Hendry Corporation must be denied.